35 C.C.P.A.(Patents)

### Application of DALZELL et al.

### Patent Appeal No. 5418.

Court of Customs and Patent Appeals.
Feb. 10, 1948.

Rehearing Denied April 2, 1948.

Norman E. H. Deletzke, of Chicago, Ill., for appellants.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, affirming the rejection by Primary Examiners of all the claims, numbered 1 to 7, inclusive, of appellants' application for patent relating to alleged improvements in a heat exchange device, such, for example, as a milk cooler. Claim 7 appears to have been inserted for purposes of appeal to the board after claims 1 to 6 inclusive had been finally rejected by the examiners.

Broadly, the rejection was based on the ground of lack of invention over prior art. The brief for appellants states:

"* * * The claims were rejected for a variety of reasons, such as anticipation by the disclosure of a foreign patent, old combination, and lack of invention over the combination of the disclosure of prior art reference patents."

Under a practice, referred to as "Dual Prosecution," now prevailing in the Patent Office jurisdiction over the claims was divided. Claims 2 and 3 were acted upon in Division 32, and the remaining claims in Division 44. The brief of the Solicitor for the Patent Office states: "The reason for this procedure, apparently, was that claims 2 and 3 are drawn broadly to heat exchange structure, while the other claims recite an 'evaporator cooler.'"

It appears that Division 44 had general jurisdiction of the application, but following the appeal to the board the examiners in the respective divisions who acted upon the case filed statements giving the reasons for their rejections, and in the case of claims 2 and 3, the examiner in Division

32 appears to have filed an answer to the brief which appellants presented before the board. In the brief for appellants before us it is asserted that appellants' attorney was not furnished a copy of the reply of the examiner before the hearing by the board, as provided by the rules of the Patent Office (referring, we assume, to the last sentence of Patent Office Rule 137) but no action by us is sought because of that, and it need receive no further attention here.

All the claims are for a structure and claims 1, 3 and 7 seem to cover all the material elements of the alleged invention. At least no feature of any one of the other claims is suggested as rendering it distinguishable in a patentable sense. We reproduce claims 1, 3 and 7:

"1. The combination with an evaporator cooler, of a liquid refrigerant storage chamber of larger capacity than said evaporator, a supply connection communicating between said evaporator and said chamber for supplying liquid refrigerant to said evaporator, positive circulating means associated with said supply connection for circulating all of the liquid refrigerant from said chamber into said evaporator and automatically controlling the flow of liquid refrigerant through said supply connection when said circulating action is interrupted, a discharge connection leading from said evaporator to the upper portion of said storage chamber, a connection for supplying liquid refrigerant to said storage chamber, and a refrigerant discharge connection leading therefrom."

"3. In a heat exchanger of the type described, a plurality of hinged heat exchange sections, a plurality of heat exchange medium supply and return headers, fluid connections between said heat exchange sections and said supply and return headers, a container shell for the storage of a quantity of heat exchange medium in excess of that required for flooding the interior of said heat exchange sections, fluid supply connections between the container shell and the supply headers, return connections between the container shell and said return headers, a fluid supply connection for said container shell, means within said container shell for separating the various phases of the heat exchange medium returned to the container shell from the return headers, and positive active means associated with said supply connection intermediate the supply headers and the container shell for regulating the flow of and for positively circulating heat exchange medium therethrough."

"7. The combination in an evaporator cooler of a refrigerant evaporator, a volatile liquid refrigerant storage chamber of larger capacity than said evaporator, a supply connection communicating with the upper portion of said evaporator and with the lower portion of said storage chamber for supplying liquid refrigerant to the upper portion of said evaporator, circulating means associated with said supply connection for positively circulating liquid refrigerant from said storage chamber into the upper portion of said evaporator and for automatically controlling the flow of refrigerant through said supply connection when said circulating action is interrupted, discharge connection communicating with the lower portion of said evaporator and with the upper portion of said storage chamber, a supply connection for supplying liquid refrigerant to said storage chamber, and a discharge connection for discharging refrigerant from said storage chamber."

The following patents are listed as references in the decision of the board:

Sulzer (Brit.), 200,518, July 6, 1923.
Gay, 1,994,037, March 12. 1935.
Kitzmiller, 2,032,286. February 25, 1936.
Mojonnier et al.. 2,040,947, May 19, 1936.
Feldmeier et al., 2,190,584, February 13, 1940.
Cornell, 2,200,355, May 14, 1940.
Thompson, 2,277,999, March 31, 1942.

The decision of the Board of Appeals covers the various elements of the subject matter, except that it does not describe appellants' structure, but accepts that given by the examiner in Division 44.

The device is somewhat complicated and many numerals and letters are use in identifying the different parts. The drawings embrace thirteen figures and the specification comprehensively describes the structure and its operation. The description given in the brief for appellants while

somewhat more elaborate than that given by the examiner does not differ from it in any essential respect.

The liquid is supplied to a distributing chamber by a pipe which is supported by a fitting that is attached to a standard. That portion of the pipe which is within the distributing chamber is provided with a series of perforations through which the liquid drains from the pipe into a W-shaped horizontal baffle in the chamber and thence through other perforations onto heat exchange sections. When the liquid is discharged from the heat exchange sections it is collected in a chamber below the sections. The latter chamber is provided with a discharge pipe which has elbows and a union. The exchange sections are supplied with liquid refrigerant from an accumulater which is stated to have a capacity in excess of the total capacity of the heat exchange systems. The accumulator is supplied with refrigerant through a conduit at the end of which, in the accumulator, there is a float valve. Refrigerant is withdrawn from the accumulator through a conduit which supplies a pump that is driven by a motor. In the specification the pump is described as "the positive acting or other satisfactory type of liquid refrigerant circulating pump 79 driven by a motor 80." From the pump the refrigerant is forced through a conduit into an oil separator from whence it passes through another conduit and through the port of a manifold supply header into the supply header. After the refrigerant passes from the supply header through the lower hinge elements and a supply conduit to a refrigerant evaporating space of the heat exchange sections, it is conveyed to a discharge header by way of a hinge arm, and thence through a return port and a conduit into the upper gas chamber portion of the refrigerant accumulator. The portion contains baffles by means of which gaseous refrigerant and liquid refrigerant are separated, the liquid refrigerant falling to the bottom of the accumulator and the gaseous refrigerant being returned through a pipe to a compressor.

In rejecting claims 1, 4, 5, 6 and 7 the examiner in Division 44 cited only the patents to Sulzer, Mojonnier et al., Feldmeier et al., and Cornell. He did not discuss them in detail pointing out that they were discussed in the statement of the examiner in Division 32 in connection with the latter's rejection of claims 2 and 3.

The examiner in Division 32 pointed out that claims 2 and 3 "are directed to a heat exchange system of general utility and are not limited to a refrigerating or cooling system." He further states (we omit letters and numerals as indicated by asterisks):

"* * * Claim 2 reads upon applicant's disclosure in the following manner. In a heat exchanger of the type described, a plurability of hinged heat exchange sections * * *, a plurality of heat exchange medium supply and return headers * * *, fluid connections between said heat exchange sections and said supply and return headers * * *, sections and said supply and return headers * * *, a container shell * * * for the storage of a quantity of heat exchange medium in excess of that required for flooding the interior of said heat exchange sections, fluid supply connections * * * between the container shell and the supply headers, fluid return connections * * * between the container shell and said return headers, a fluid supply connection * * * for said container shell, means within said container shell for separating the various phases of the heat exchange medium returned to the container shell from the return headers (baffles * * * in shell * * * separate the liquid and gaseous refrigerant) and means associated with said supply connection for positively circulating and regulating the flow of heat exchange medium intermediate the supply headers and the container shell * * *.

"Claim 3 is substantially similar to claim 2 but recites the pump * * * in slightly different terms."

"He cited and described the several reference patents cited by the examiner in Division 44, and in addition cited the patents to Gay, Kitzmiller and Thompson.

The pertinent disclosures of the references will probably be best understood when applied to the claims.

The elements of claim 1 are (1) an evaporator cooler, combined with (2) a liquid

refrigerant storage chamber; (3) a supply connection (in which there is a pump) between the evaporator and the chamber; (4) positive circulating means (the pump) associated with the supply connection; (5) a discharge connection leading from the evaporator to the upper portion of the storage chamber; (6) a connection for supplying liquid refrigerant to the storage chamber, and (7) a connection leading from the storage chamber through which refrigerant may be discharged.

In the Sulzer patent refrigerant is supplied to a vaporizer through a conduit, a throttle valve and a tube. The evaporated refrigerant and entrained unevaporated refrigerant are discharged from the evaporator into the upper portion of an accumulator. The unevaporated refrigerant falls to the lower portion of the accumulator and is recirculated into the evaporator by means of a pump identified in the patent by the small letter "g." (The specification states that the pump may be replaced by an ejector fed from a condenser). The evaporated refrigerant is conducted from the accumulator through a conduit to a compressor. So, each of the physical elements of appealed claim 1 is found in the Sulzer patent and it may be said that each of them is identified by a letter, except the pipe which constitutes the discharge connection leading from the evaporator to the upper portion of the storage chamber. It seems obvious that there would have to be such a connection and it is shown in the Sulzer drawing. Indeed we do not find that the failure to identify this element is regarded as consequential by appellants.

The features or elements of claim 1 are present in claim 7, with some additional limitations, and the latter was rejected, at least in part, upon the same grounds as the former.

It is contended on behalf of appellants that, independently of the elements which we have pointed out, there are two matters of structure stated in claims 1 and 7 which are not disclosed by the prior art and which render those claims patentable. The first is, in substance, that the chamber in which the refrigerant is stored is of larger capacity than the evaporator cooler. So

far as we are able to determine from appellants' specification no new or unobvious result was obtained by adjusting the size of the storage chamber to the necessities of the operation—that is making it large enough to hold at all times a sufficient quantity of liquid refrigerant to operate the device. It is a matter of designing which any one skilled in the art obviously could and would perform. So, like the board, "We are unable to see any invention whatsoever in the limitation with respect to the relative capacities of the various elements of the system."

The second matter appearing in claim 1 (and seemingly in all the other claims in somewhat different phraseology) which is emphasized in the brief for appellants is the clause reading "positive circulating means associated with said supply connection for circulating all of the liquid refrigerant from said chamber into said evaporator and automatically controlling the flow of liquid refrigerant through said supply connection when said circulating action is interrupted."

The controversy on this phase of the case seems to be about the pump which constitutes the "positive circulating means" referred to at the outset of the clause.

The contention of appellants before us is, as it appears to have been before the several tribunals of the Patent Office, that the type of pump the use of which is taught by the Sulzer patent is not the character of pump required by the count. The brief asserts:

"The primary reference patent, that is, the British patent to Sulzer, * * * contains no suggestion whatsoever with respect to the use of a positive displacement type of pump, also capable of functioning as a valve, for the circulation of the refrigerant to the evaporator. * * *"

There was no discussion of this phase of the case by the examiner in Division 44, nor did he formally rule upon it. He expressed the view that the clause was based upon matter introduced into the specification by amendment, cancellation of which he required, or requested, on the ground that it was new matter. The board held that it was not new matter and passed up-

on the question as hereinafter set forth. It is noted that the examiner in Division 32 declared:

"Claims 2 and 3 as amended include references to the pump 79 as positively circulating and regulating the flow of heat exchange medium. Applicant has shown no details of any special pump design. Accordingly it must be assumed that any conventional pump would be used. Although the British [Sulzer] patent discloses on the drawing a reciprocating pump, the specification does not refer to the pump as such. The disclosure of the patent is therefor' clearly diagrammatic in character and the use of any conventional type pump is believed to be indicated. In any event, no invention lies in using such conventional pumps, whether of the reciprocating, rotary, or ejector type. Note the British patent says that the ejector type may be used * * *."

The board expressed the view that Sulzer's pump is in fact a positive displacement pump, and states its disagreement with appellants' interpretation of the operation of the Sulzer device which is to the effect that the liquid refrigerant flows by gravity through Sulzer's pump into his evaporator when the pump is not working. This contention on behalf of appellants, as we understand it, is based upon the fact that the type of pump disclosed in Sulzer's drawings does not act as a valve, but the board says in substance that check valves are usually employed to prevent such flow and cites the Kitzmiller patent as an example. That patent, which relates to a refrigerant liquid return system, discloses a pipe line between a pump and an evaporator which line is equipped with a check valve or, alternatively, with an electrically operated valve in parallel with the pump motor. As is pointed out in the brief of the Solicitor for the Patent Office "Kitzmiller's valve is located at the point called for by claim 1, namely, in the supply line leading from a storage vessel to an evaporator in a refrigerating system."

Proceeding further, the board suggested certain so called modifications of the Sulzer structure by an arrangement of valves by which the flow of liquid refrigerant from the accumulator into the evaporator when the pump is not working would be prevented. Seemingly this would involve the introduction of what the board refers to as "positive acting valves" not now present in the Sulzer reference. It may be said that the examiner in Division 32 also outlined so called modifications, such as the elevation of Sulzer's pump and the equipping of the pump with certain valves not now in the system.

We are not impressed that the suggestions involving the introduction into the Sulzer system of features not found therein constitutes a valid ground of rejection, unless such features are found in related cited art. We are impressed, however, with the finding relative to the disclosure of the valve in the Kitzmiller patent. Unless we misinterpret the teaching of that patent it bears out the assertions in the brief of the Solicitor for the Patent Office to the effect that the Kitzmiller valve, if placed in that supply line of Sulzer which leads to the evaporator, would cut off the flow of the liquid refrigerant when the pump stopped.

In the brief of the Solicitor for the Patent Office we find certain observations relative to the functional character of that clause of claim 1 now under discussion which, while possibly inherent in the decisions of the examiners and the board does not seem to have been clearly expressed by them.

The use of "positive circulating means," which is the pump that is associated with a supply line, has a two-fold purpose, viz.: (1) For circulating all of the liquid refrigerant* from the storage chamber into the evaporator, and (2) for automatically controlling the flow of liquid refrigerant through the supply connection when the circulating action is interrupted. It is the second purpose which is of importance here, because the first—that is the circulation—obviously is carried out by the Sulzer device as it stands without alteration or modification.

The brief of the Solicitor for the Patent Office asserts that "automatically controlling the flow of the liquid refrigerant

through said supply connection when said circulating action is interrupted," is a purely functional statement "there being no structure recited which would produce the result called for." The brief further asserts (with a citation of authorities, including In re Stattman, 146 F.2d 290, 32 C.C.P.A., Patents, 813, that "A statement of function is not sufficient to render an apparatus claim patentable if the structure recited is old."

One of the difficulties which seems to us to have been present in this case throughout its prosecution has been the absence of any definite understanding of the meaning of the phrase, "positive circulating means," as it is used in the claims. The examiner in Division 44 when discussing the question of new matter said, inter alia: "* * * The specification did not give any information teaching the distinction, if there be any, between various pumps in good operative condition which makes one pump "positive acting" while another effective pump is not positive acting. * * *"

While the board expressed the opinion that the pump of Sulzer is "a positive displacement pump," we do not find where it distinguished between pumps that are positive and pumps that are not positive. It is possible that the board predicated its conclusion upon a statement which appeared in the brief of the examiner in Division 32 filed in reply to the brief of appellant before the board which we here quote:

"Applicant in his brief, for the first time, refers to Kent's Mechanical Engineering Handbook for 'a definition of the expression positive pump.' The examiner can find no such definition therein. The statement on page 2–72 is: 'A rotary pump is a positive displacement pump driven from an independent prime mover through a rotating shaft.'

"This is merely a definition of a rotary pump. This does not imply that the reciprocating pump g of the reference patent to Sulzer Bros. is not also a positive (displacement) pump. Such pump is a positive displacement pump. Page 1 of Section III entitled Power Pumps of The Worthington Pump Handbook, published by Worthington Pump and Machinery Corp. New York 1927 says: 'In pump nomenclature the term "power pump" has but one accepted meaning, and is only applied to positive displacement pumps operated through cranks and connecting rods by the application of power to the crankshaft. A power pump works just like a reciprocating engine, except that the power action is reversed.' From this, it is clear that a reciprocating pump is a positive displacement pump also."

Unhappily, when we turn to the brief of appellants for aid upon this question, we find nothing which is of any particular benefit. It states, without citing any lexicographer or other authority, that, " 'Positive pumps' are commonly considered to be such pumps as gear pumps, vane pumps, and the like, as distinguished from centrifugal pumps," and it contains the statement: "A conventional type of reciprocating pump, i. e., the type of plunger pump *disclosed in the Sulzer reference patent, is also a positive pump.*" (Italics ours.) The brief continues, however:

"* * * Conventional types of reciprocating pumps are equipped with gravity-actuated check valves (See [Patent Office] Rules of Practice, page 62, Figures 26, 27 and 28), which will not enable the pump to produce a valving action in the flow line when the flow line is under a pressure head. * * *"

We have spent much time studying the question raised by appellants respecting the "positive circulating means" (that is the pump) feature of the appealed claims and have devoted much space to its discussion because that feature seems to constitute the heart of appellants' alleged invention.

It is our conclusion that appellants have failed to substantiate the allegations of error upon this point set forth in the reasons of appeal.

The brief of the Solicitor for the Patent Office succinctly summarizes the matter in the following statement:

"To sum up, the limitation in claim 1 as to the controlling of flow does not distinguish patentably from Sulzer, first, because

it is a purely functional limitation in an apparatus claim, secondly, because the function, as broadly recited, is inherent in the normal operation of the Sulzer device and, thirdly, because, if it were not so inherent, no invention would be involved in modifying Sulzer's structure in such a manner as to produce it."

■■■ The limitation in claim 7 (not present in any of the other claims) which appellants most strongly emphasize before us is that of the refrigerant supply line running from the upper portion of the evaporator to the lower portion of the storage chamber. This is a reversal of the order described in claim 1, supra. The arrangement does not seem to be illustrated by a drawing, nor does the specification, although seemingly sufficient to support it, recite any advantages for it. The brief for appellants asserts some advantages but it is the specification which must be looked to in situations such as this. Abbott et al. v. Coe, 71 App.D.C. 195, 109 F.2d 449. The board did not discuss claim 7 apart from claim 1 but the examiner, in Division 44, said:

"* * * connecting the evaporator supply conduit of Sulzer from his liquid refrigerant accumulator or storage chamber to the upper portion of his evaporator C and connecting his evaporator discharge conduit from the lower portion of his evaporator to the upper part of his accumulator or storage chamber as required by the claim would not involve invention."

We presume the board agreed with that statement. At any rate, we find nothing wrong with it.

Claims 2 to 6, inclusive, in addition to being rejected as unpatentable over the Sulzer patent (certain of the other references being cited in connection with certain limitations), for the same reasons applied in the rejection of claim 1, were also rejected as being drawn to the old combination of a storage chamber and an evaporator with a pump for circulating refrigerant between them. Sulzer, of course, shows such a combination, and it seems to us that the Kitzmiller patent does also.

"Hinged" or "swingably mounted" heat exchange sections are disclosed by the patents to Mojonnier et al., Cornell and Feldmeier et al. Baffling elements to aid in the separation of liquid and gaseous refrigerant are shown in the patent to Thompson and in that to Gay.

In view of our conclusion based on the grounds hereinbefore stated and discussed, it is deemed unnecessary to consider the other grounds applied by the tribunals of the Patent Office.

For the reasons indicated the decision of the Board of Appeals is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.