ROTA-CARB CORPORATION, a New
York Corporation, and Bernard
Harmon, Plaintiffs,

v.

FRYE MANUFACTURING COMPANY,
an Iowa Corporation, Defendant.

Civ. A. 3-835.

United States District Court
S. D. Iowa,
Central Division.
July 18, 1961.

Charles F. Swisher, Waterloo, Iowa, Samuel J. Stoll, Jamaica, N. Y., for plaintiffs.

Irvin V. Gleim, Dayton, Ohio, John C. Eddy, Des Moines, Iowa, for defendant.

VAN PELT, Judge.

This is an action to enjoin infringement of a patent, Exhibit 1, issued February 12, 1957 to Bernard Harmon. Thereafter it was assigned by Harmon to plaintiff corporation. No question is raised by defendant as to the sufficiency of this assignment and the court will therefore consider that the proper parties plaintiff and defendant are before the court. The court finds that there is diversity of citizenship and that the court has jurisdiction of this case under Title 28 U.S.C.A. 1338(a).

It was agreed at the pretrial conference that the issues were

a) the validity of the Harmon patent, and

b) infringement.

In event of a finding for plaintiffs upon the issues just mentioned it was agreed that the damages, if any, would be determined later.

Plaintiffs claim that this patent, which is a method patent, teaches a new and novel idea as to the printing of spot carbon paper. Methods for making full sheet carbon paper have been known and used for many years. Spot carbonizing, or the making of a spot carbon paper, is of more recent origin. It consists of carbonizing portions of a sheet of paper and leaving other portions blank whereby the copies will not each contain all of the information typed upon the original

and the separate carbon copies do not necessarily contain the same information. Exhibits 2 and 3 are examples of the product turned out by processes similar to those involved herein.

Harmon says that as a result of an approach from The Mutual Life Insurance Company of New York which he could not fill, he became interested in spot carbonizing in 1948, and in April of 1948 conceived the idea which he eventually patented. The basic features of Harmon's patent are

a) A fountain in which the ink is heated before it is applied and in which it is kept in a fluid state. Harmon suggests a temperature of 300° to 400° for this ink. Defendant claims to know of no ink requiring such temperatures and in its processes the ink reaches temperatures of 180° to 220°.

b) A heated roller which picks up ink from the fountain and delivers it to

c) a printing roller on which there is fastened in a manner easily removable, a metal strip (See Exhibit 5) to which is vulcanized or otherwise attached a rubber sheet so cut as to place or deliver the ink on the press in the spots or places desired.

d) Two cooling rollers past which the web of paper passes and is cooled and from which it goes to a round spool on which the paper is eventually wound.

Harmon also claims the use of a rubbery heat insulating material on the rollers which he proposes and an easily removable printing sheet.

The court should therefore discover the state of the art at the time of Harmon's conception of the patented idea. The court will not discuss all of the patents and articles cited.

It is to be here observed that defendant's witness Doven selected the British Hodler patent, dated December 30, 1925 (Exhibit 21) and the two Rutkoskie patents, dated June 5, 1934 and July 6, 1937 respectively (Exhibits 31 and 34), as the ones he considered to be closest to the patent in suit, while in the brief counsel discusses only the Allen patent (Exhibit 12) dated January 4, 1898, the McManus patent (Exhibit 22) dated December 24, 1929, and an article dealing with spot carbonizing (Exhibit 39) which appeared in Modern Lithographer and Offset Printer, in May, 1947. From this plaintiffs argue that all prior art exhibits, excepting only Exhibits 12, 22 and 39, have been abandoned. The court concludes, however, from the oral argument that counsel for defendant has not limited itself to a few of the patents but can rely upon any of the patents or articles received in evidence to show the state of the art and to show that there is nothing new or novel in Harmon. Plaintiffs' wish for abandonment is probably father to the thought that would avoid consideration by the court of Hodler and many other cited prior art patents.

Hodler held not only the British patent, Exhibit 21, but also an American patent, Exhibit 7, dated March 12, 1929. It seems to the court from the evidence adduced that Hodler first conceived a workable hot spot carbonizing process for carbon paper. He antedates Harmon by nearly twenty years. It further appears that Hodler had all of the features of Harmon except only that where Harmon had one roller between the fountain and the one printing roller, Hodler had two, and Harmon's claim set forth that the rollers shall have a rubberized heat insulating cover and has the printing sheet more easily removable than in Hodler. These matters are hereafter discussed.

The witness Doven called by defendant, claims that in 1948 or 1949 he had a conversation with Harmon and told him of the machines that he, Doven, had built. He says he had built two spot carbonizing machines prior to 1948 and that he gave Harmon some of the ideas of Harmon's patent. Doven's testimony is not entirely clear as to the exactness with which he explained his idea. Harmon denies such a conversation with Doven or any conversation until after 1950, the date he applied for a patent, and substantiates his oral testimony by a telegram received during the trial from a third party indicating that the date of the conversa-

tion was later than Doven claims. Credence must be given Harmon's testimony that the conversation was after the purchase by Harmon of a certain press, if the telegram is to have probative value. No objection was made on the ground of hearsay and the telegram thus casts some doubt on the time of the conversation. The court was impressed with Doven's sincerity and concluded from the testimony that he had antedated Harmon in the design of hot spot carbonizing. The court should here state that the evening following this trial the court wrote out in longhand most of the factual findings of this decree, including the observations just stated. A reading of the record has not caused any substantial change in the factual observations made following the trial. It concludes it does not need to pass on or determine whether Harmon received his ideas from Doven. Conflicts in the testimony between Doven and Harmon relative to whether Harmon had recently said he would never sue Doven also do not need to be resolved, and the attempt of the company by which Doven is employed to procure a license from Harmon is subject to the inferences drawn by each of the parties and is not deemed controlling in the decision here announced.

There is considerable testimony as to the rubber used by defendant and the rubber described by Harmon and whether such rubbers are heat insulating or heat conducting. These matters are commented on hereafter by the court.

The evidence convinces the court that the idea of spot carbonizing was not new with Harmon. Exhibit 19 shows an article on the subject as early as June, 1914, and Exhibit 39 shows an article in May of 1947. Doven says with the knowledge of Worth's article of May, 1947 he could have built a machine. Hodler as above suggested, had the idea as early as 1929 and the Allen patent of 1898, as hereinafter mentioned, contains many of the basic ideas found in Harmon.

Examining Harmon in more detail, it is to be observed that the fountain which Harmon utilizes is found in Allen (Exhibit 12) and Hodler (Exhibits 21 and 7). All parties agree that the ink must be kept hot to best impregnate the paper although they disagree as to the necessity of one of the features of Harmon as hereinafter mentioned, namely, use of rubber with heat insulating qualities. The use of a roller in the fountain to convey the fluid to the impression roller was not new. See Hodler and Allen patents above mentioned; Reutener, Exhibit 23; Rutkoskie, Exhibit 27; and Supligeau, Exhibit 29. The heating of the rollers conveying the fluid is shown in Rutkoskie, Exhibit 31, and the heating of the printing or impression roller was not new (See Hodler and Allen.) Even the idea of one roller which to a degree differentiates Harmon from Hodler was not new (See Hummelchen patent, No. 2,310,788), a patent which was not offered in evidence but which is discussed in Exhibit 8. See, also, Thompson, No. 1,977,460 of October 16, 1934, which was not offered.

Doven says all of these basic ideas of Harmon were known before Harmon; that he had never thought of checking for a patent believing at an earlier date than the date on which Harmon applied for a patent that there was nothing patentable in the ideas.

It is to be observed from Exhibit 17 that Harmon attempted to patent a machine known as a "Rotary Hot Wax Spot Carbon Coating Machine and Method" and the denial to Harmon of the patent was upheld by the United States Court of Customs and Patent Appeals (See In re Harmon, 222 F.2d 743, 42 CCPA 921) (See Pages 80–88, Exhibit 17).

In discussing some of the earlier patents, the Board of Patent Appeals in the last cited case, makes statements which have a bearing on the teachings of the prior art in this method patent.

The court said:

"Relative to the structural recitations in the claims, it certainly appears to us that the printing surfaces of the references are of uniform thickness, as pointed out by the examiner. Both references teach the use of printing 'blocks' or surfaces of

resilient material. The spotting elements (blocks) of McManus are detachably secured to the roller, and the roller of Allen is heated. We are of the opinion that the examiner was correct in holding that there was no invention in substituting the removable blocks of McManus for the fixed blocks of Allen, since it is well settled that prior patents can be combined for the purpose of anticipating claims, In re Delancey, 177 F.2d 377, 37 C.C.P.A., Patents, 760, when they suggest doing the thing that appellant has done. In re Fridolph, 134 F.2d 414, 30 C.C.P.A., Patents, 939. That the references would have suggested doing what appellant has done to anyone skilled in the art seems beyond doubt since both references relate to coating, and McManus is primarily concerned with roller construction for coating.

"It is to be noted that claim 21 recites a roller to which the printed paper is fed and upon which it is wound. The Allen reference does not show this feature, since the printed paper is fed directly to a cigarette-making machine. However, we feel, as did the examiner, that the winding up of the coated paper of Allen rather than the putting it to use would not involve patentable invention since it is an arbitrary change well within the skill of the art. The recitation of structure in the claims for accomplishing a non-inventive function will not cause the claims to be patentable over the prior art notwithstanding that these non-inventive features are not shown in the prior art. In re Bisley, supra [197 F.2d 355, 39 C.C.P.A., Patents, 982]."

Application of Harmon, 222 F.2d 743, at pages 746–747.

It is to be observed that defendant purchased the equipment it is using prior to the time that Harmon's method patent was granted.

At the request of the parties the court went to defendant's plant and in the presence of counsel inspected defendant's machine while it was in operation. From this inspection and the study of the exhibits and testimony the court adopts the defendant's view that Harmon's method, notwithstanding Exhibit 4, is unworkable.

Samples made by defendant using rollers simulating Harmon, were introduced in evidence (Exhibit 42); they were received in support of the opinion of witness Satre that the Harmon method would not work. The samples do give support to his conclusion. Mr. Doven also expressed the opinion that the Harmon method would not work. Mr. Satre's deposition was taken on May 28, 1958 and Exhibit 42 was then produced and identified by another number. Plaintiffs knew from then on and may have known earlier of defendant's claim that Harmon's method would not work.

This is important because it is to be remembered that neither Harmon nor the Rota-Carb Corporation has ever made a machine following the teachings of Harmon's method. The court realizes that this is a method and not a machine patent but the fact that Harmon has never made a machine following his teachings, taken with all the other testimony, and with the observation of defendant's machine, convinces this court that Harmon's method as taught in his patent, will not work. While an explanation is not needed for his not making a machine, and the following statement is to a degree a gratuitous one, the court must admit that it cannot escape the feeling that if Harmon's method would work he would have produced a machine during these years that have intervened.

Attempts are made in the brief to circumvent this by claiming certain rollers were conventional and Harmon did not need to show them in describing his method:

"True, the patent drawing does not disclose an ink metering or distributing roller, or a frame supporting the rollers shown or bearings for such rollers or a drive mechanism or ink cooling and drying means. But

these elements are all well known and entirely conventional, those who are skilled in the art need no instruction regarding them, and consequently the patentee is not required to teach them in order to have a valid patent. It will be seen in some of the patents cited in defense of this action that it is a common practice to exclude from a patent drawing conventional components which are known to the art.
\* \* \*

"There is no question but that a metering or distributing roller would improve the performance of the invention. But this is true of all printing machines, without exception. The patent does not deprive the art of a key ingredient of the invention by failing to show or claim a metering or distributing roller.

"The foregoing discussion is predicated upon the assumption that a conventional metering or distributing roller is required in the performance of the patented method. It is plaintiffs' position that even if this be so, the patent is not required to teach the use of such roller to those who are skilled in the art, any more than the patent is required to teach the use of bearings to support the rollers, a frame to support the bearings and a drive mechanism to rotate the rollers. Aside from this however is the fact that the patented method will perform properly even without a metering or distributing roller. It may not perform as well or as fast, but perform it will. At the proper time in the course of the trial proceedings, evidence will be presented to show that the patented invention is entirely operative without the use of a metering or distributing roller or equivalent." (Plaintiffs' Supplemental Trial Brief, Pp. 4, 5, 6)

This argument now made is inconsistent with the argument made on Harmon's behalf in Exhibit 8, in Gavrin Interference proceeding, where Harmon contended that he provided only an inking roller 21, mounted in a pan 22, containing the heated ink, and the statement that "This inking roller is in direct contact with the printing elements on printing roller 16", and with other statements in Exhibit 8:

"The claim is a method claim and it deals with printing carbon transfer ink in a spaced design on paper and it involves melting the ink, transferring it to a rubber roller and from said rubber roller to a rubber typographic printing plate and then from said printing plate to paper in a continuous process." (P. 33, Exhibit 8)

"The count of the interference does not require more than a single transfer or inking roller between the fountain and the printing plate. Harmon uses only one roller and Waroff and Gavrin use two but that is a matter of preference and does not bear upon the question of whether Harmon has the right to make the count." (P. 72, Exhibit 8)

The examiner clearly found that Harmon had a two-roll system in which a fountain roller applies the copying ink directly to the printing roller (See Page 76 of Exhibit 8).

The court feels, therefore, that the argument now advanced by Harmon as to the use of an additional or metering roller is an afterthought and that he did not contemplate a roller or metering system such as defendant is using when he made application for his method patent.

Nor has Harmon convinced the court, as indicated in his trial brief, "that the patented invention is entirely operative without the use of a metering or distributing roller or equivalent."

That there were many things well known to persons skilled in the art including Harmon, is further shown by the brief which he filed in the interference proceeding, (Exhibit 8):

"It so happens, however, that all persons skilled in this art, including Harmon, are aware of the need to maintain a molten ink in a molten

state in order to transfer it to a printing roller and from the printing roller to paper. For example, Harmon states in his specification, page 6, beginning on line 15: 'This type of ink is solid and dry in room temperature and a relatively high degree of heat is required to maintain it in a sufficiently fluid state to coat the paper in accordance with the method herein described and claimed. Depending upon its composition, the ink may require a temperature of 300° or 400° of heat to maintain its fluidity.' To insure such fluidity, Harmon not only heats the pan containing the ink but he also heats his printing roller." (P. 30, Exhibit 8)

He also discusses the use of the word "rubber" on his inking roller, saying:

"Inking or transfer rollers are conventionally made of or coated with rubber capable of transferring ink to a printing roller. What is purely conventional need not be described in detail. Rubbery, heat insulating material is always used in rubber or rubber coated inking or transfer rollers, especially those which are employed in connection with molten ink. It does not add anything to the art to describe what is already known, as Waroff and Gavrin have done, and by the same token Harmon's omission of a detailed description of a conventional device does not deprive him of the right to claim that device, as part of his combination, in the manner set forth in the count of the interference.

"The word 'rubber' as normally used and understood, denotes a rubbery substance and it is a fact that all rubbers commonly designated by the term 'rubber' are heat insulating. Some rubbers may be more rubbery than others but all rubber, in the commonly accepted sense of the term are rubbery. When it is desired to refer to a rubber which is not rubbery or resilient, the term 'hard rubber' is used." (P. 31, Exhibit 8)

"Waroff and Gavrin are clearly inconsistent in making the motion to dissolve upon this ground and the rule of estoppel clearly applies. They do not state that the count of the interference is unpatentable over the prior art; what they do state is that it is unpatentable to Harmon because Harmon uses a rubber roller and that it is patentable to themselves because they use a roller made of rubbery, heat insulating material.

"Why this distinction should render the claim patentable to Waroff and Gavrin and not patentable to Harmon is quite a mystery. What Waroff and Gavrin are really doing is simply supplying conventional adjectives to known properties. For example, when we speak of a hammer or a saw we do not find it necessary to describe them as being made of steel. Nor do we find the need of describing the alloy of which they are made or the properties of a steel of such alloy. It would be different if the tools were to be used for unusual purposes, as for example, the use of a saw as a musical instrument, in which case a certain alloy might be conducive to good results while other materials may not.

"In the present case, however, everybody who transfers a molten ink to a printing roller and from a printing roller to a sheet of paper utilizes an inking or transfer roller which is coated with a rubbery, heat insulating rubber. Consequently, if this claim is patentable to Waroff and Gavrin because they describe their transfer roller as being made of rubbery, heat insulating material, it is also patentable to Harmon by virtue of the fact that his inking or transfer roller is made of rubber." (P. 32, Exhibit 8)

It is to be observed that the examiner in this matter found " * * * that rubber as used in the art normally means a rubbery and heat insulating material." (Pages 41, 42, Exhibit 8) He also says that an applicant need not set out what is

old and well known in the art. This is of course Harmon's claim with reference to the metering roller. The matters are referred to here because it convinces the court that Allen's teachings were broad enough to encompass Harmon. Allen said that his rollers may be made of any suitable material such as "rubber". The court therefore disagrees with the examiner in exhibit 8 that in interpreting Allen, "rubber" must mean a heat conductive material. The court believes that if in interpreting Harmon, "rubber" means a heat insulating material, and he was permitted to so describe it that it can be so read as to Allen.

Supplying to Allen what Harmon calls "conventional adjectives to known properties", Allen in 1898 had all the ideas including a rubbery and heat insulating material, that Harmon utilizes except the feature of the removability of printing blocks. The Court of Patent Appeals correctly held that there was no invention in substituting the removable blocks of McManus for the fixed blocks of Allen.

■ Defendant offered in evidence Exhibit 41. The offer was refused by the court over the objection that the statutory thirty days notice had not been given. See Title 35 U.S.C.A. § 282. It is argued, however, that although the notice had not been given thirty days prior to the trial, the statute provides that proof may be made upon such terms as the court requires, and that it should therefore be received. The facts in this case do not justify the admission under this sentence of the statute. Exhibit 41 had been in counsel's possession since soon after October, 1958. At the pretrial held in August, 1959 there was reference to the fact that there might be additional patents presented and Mr. Stoll then requested the usual thirty days notice in advance of trial. Certain patents were added to the notice and this patent in possession of counsel, was not mentioned. The court believes that reliance on this prior art should have been disclosed at the pretrial conference; that the orderly process of trying patent cases does not allow counsel when asking such specific questions as the court asked in this case, to withhold notice of the patent or prior art until less than thirty days before trial and then expect it to be received. It therefore abides by its ruling at the time of trial and has given no consideration in this decision to Exhibit 41.

■■ The law applicable to this case is well nigh elementary. The claims are the measure of the patentee's protection. They are construed not only in the light of the specifications and drawings but also with reference to the file wrapper history. As a result, claims are to be read and interpreted having in mind any claims that were rejected or withdrawn because they cannot be construed to cover matters eliminated or disclaimed.

■ It is elementary that there can be no infringement if the patent is invalid for want of invention. The patent is to be tested by whether it results from inventive genius. The function of a patent is to add to the sum of useful knowledge.

■ As pointed out by Judge Sanborn in Caldwell v. Kirk Manufacturing Company, 8 Cir., 269 F.2d 506, if it only combines what was common knowledge and what was disclosed by the prior art, it does not rise to the dignity of patentable invention.

Applying the law as just stated to the facts which are relatively clear, it follows that Harmon's conception of April, 1948 resulting in the Patent, Exhibit 1, did not rise to the dignity of patentable invention and that plaintiffs cannot prevail in this action.

The court therefore concludes that one in the position of Harmon in early 1948 did not exercise any inventive genius in putting together the ideas known to printers in the field and available to artisans generally when he conceived the ideas which he set forth in his patent application.

■ The court concludes that each of claims 1 to 4 of patent Number 2,781,278, being Exhibit 1, are invalid and void for lack of invention; that the real inventive genius was in Allen, Hodler, Mc-

Manus, Rutkoskie and others who have been mentioned. It follows therefore if the patent is invalid for want of invention, that none of the claims of the patent, Exhibit 1, have been infringed by the hot spot carbonizing method employed by the defendant, and judgment must be entered dismissing plaintiffs' complaint.

A separate order will be entered.