L. S. DONALDSON COMPANY and G. Barr and Company, Appellants,

v.

LA MAUR, INC., Appellee.

LA MAUR, INC., Appellant,

v.

G. BARR AND COMPANY, Appellee.

Nos. 16753, 16754.

United States Court of Appeals Eighth Circuit.

Feb. 19, 1962.

Rehearing Denied March 19, 1962.

Harold D. Field, Jr., Minneapolis, Minn., for LaMaur, Inc.; Sidney Barrows and Leonard, Street & Deinard, Minneapolis, Minn., with him on the brief.

Dean Laurence, Washington, D. C., for L. S. Donaldson and G. Barr & Co.; Herbert I. Sherman, Washington, D. C., with him on the brief.

Lee Bearman, of Levitt, Palmer & Rogers, Minneapolis, Minn., and Richard Whiting, of Davis, Hoxie, Faithfull & Hapgood, New York City, filed brief on behalf of Rayette, Inc., amicus curiae.

Before SANBORN and VAN OOSTERHOUT, Circuit Judges, and GRAVEN, District Judge.

GRAVEN, Senior District Judge.

In the present action the plaintiff below, La Maur, Inc., charged the defendants below, L. S. Donaldson Company and G. Barr and Company, with patent infringement. It also charged the latter defendant with the misappropriation of a trade secret. The subject matter of the controversy is an aerosol hair spray. The trial was to the Court without a jury. The trial court held that the patent involved was valid and that it had been infringed by both defendants. It also held that the plaintiff had not established its claim for the misappropriation of a trade secret. The memorandum opinion of the trial court in connection with its decision is reported at 190 F. Supp. 771. Both defendants appealed from the decision of the trial court as to the validity of the patent and as to the infringement by them. The plaintiff appealed from the decision of the trial court denying it relief for the misappropriation of the trade secret. Since there are two appeals involved, the parties will be referred to throughout as plaintiff and defendants rather than as appellants and appellees.

The plaintiff, La Maur, Inc., is a Minnesota corporation engaged in the manufacture of cosmetics at Minneapolis, Minnesota. The defendant, L. S. Donaldson Company, is a Minnesota corporation which operates a department store in the same city. The defendant, G. Barr and Company, is an Illinois corporation engaged in the manufacture and processing of cosmetic products at Chicago, Illinois. The defendant, L. S. Donaldson Company, is a customer of the defendant, G. Barr and Company, and the accused product handled by the former was supplied to it by the latter. The latter handled the entire defense of the action.

It seems that the purpose of a hair spray of the type in question is to provide hair with a brilliant or luster-like film. Experience in the industry has shown that to achieve the most satisfactory result a number of substances are required. A substance having a resin ingredient is generally used to provide brightness and luster. Such an ingredient tends to be hard and brittle. In order to avoid the cracking of the film made by that ingredient, it is necessary to modify its somewhat harsh and brittle characteristics. The film is made more flexible by the use of a plasticizer. It is desirable that the film dry quickly after application. Therefore, the film ingredient should be carried in a liquid which

dissolves quickly upon exposure to the air. It is also desirable that the film be readily removable by washing the hair in water. While perfume performs no particular function in a hair spray, it is frequently added for the purpose of customer appeal. The liquid carrier for the substances may be alcohol or water, or both. In the earlier years of the hair spray industry, hair sprays were contained in nonaerosol type containers. However, it was found that hair sprays are best applied by means of aerosol type containers. In aerosol type containers use is made of a chemical known as dichlorodifluoromethane, commonly called Freon. Freon has long been manufactured by a nationally known organization and widely used for many types of sprays. The composition of the accused product involves a scientific field known as polymer chemistry. This has to do with certain types of large molecules known as polymers. Polymers may be either of natural or synthetic origin. They are more commonly of synthetic origin. Synthetic polymers have been successfully used in the manufacture of synthetic rubber, plastics, nylon and other synthetic fibres.

The relevant facts and chronology in the present case are largely as follows. Prior to 1938 the I. G. Farben Industry in Germany had developed a synthetic polymeric resin known as polyvinylpyrrolidone. In polyvinylpyrrolidone there are two well-known types of chemical groups. One is the vinyl group and the other is the pyrrolidone group. The vinyl groups combine with each other in a linear form and may be compared to links connected to form a chain. Each link is a vinyl group so to speak and to each vinyl group is attached a pyrrolidone group. The ratio of vinyl groups to pyrrolidone is 1:1, so one unit of the big (polymer) structure is vinylpyrrolidone and as these units join they form a polymer. The polymer forms a rather hard, resinous material, the plasticity of which may be modified with plasticizers. Polyvinylpyrrolidone usually comes in the form of white powder. It is soluble in both water and alcohol.

The General Aniline & Film Corporation is a large company engaged in the manufacture and distribution of chemical products. Several years prior to 1951 it had secured the rights to manufacture and distribute polyvinylpyrrolidone, generally known and referred to as PVP. Prior to 1952 PVP had been sold for pharmaceutical uses, the most important of which was as a substitute for blood plasma. In April, 1951 M. L. Spiegel, the president of the plaintiff, acting for the plaintiff, ordered a sample of PVP iodine from the General Aniline & Film Corporation. Along with the sample requested, the company sent a sample of PVP as being of possible interest to the plaintiff. In making tests of the samples, Spiegel noticed that PVP when rubbed on the back of his hand left a very shiny surface. The thought occurred to Spiegel that PVP might be usable in a hair fixative.

In 1951 and prior thereto, the defendant, G. Barr and Company, had facilities which were especially adaptable for the filling, loading, or packaging of cosmetic products in containers. It is one of the largest companies in that field. On July 6th, 1951, the plaintiff wrote the defendant, G. Barr and Company, stating that it was making experiments in developing a hair lacquer formula. It further stated that it was sending samples of a formulation which it desired to have packaged in propellant cans. It stated that in the samples anhydrous alcohol was used as a solvent and inquired whether the use of such alcohol was an absolute requirement in connection with the packaging of the formula. Anhydrous alcohol is a water-free alcohol. On July 9th, 1951, the defendant, G. Barr and Company, informed the plaintiff that anhydrous alcohol and anhydrous materials throughout were absolutely necessary since the presence of water would cause corrosion in the cans. Sample aerosol cans containing the plaintiff's formula were made up for the plaintiff by the defendant, G.

Barr and Company, on or about July 10th, 1951. Prior to 1952 the General Aniline & Film Corporation had been selling PVP for pharmaceutical use at $12.00 a pound, which made it too expensive for use in hair sprays. Early in 1952 the plaintiff made arrangements with the General Aniline & Film Corporation to purchase dry PVP of a non-pharmaceutical grade for $6.00 a pound. The price was subsequently reduced to $3.00 a pound.

In March, 1952, the defendant, G. Barr and Company, packaged in aerosol cans a supply of plaintiff's hair spray formula. The formula met with a favorable response on the part of customers selected by the plaintiff. Because of that recognition, the plaintiff proceeded to market its preparation with ever increasing success. It is marketed under the trade name of "Style." On July 31st, 1952, Spiegel, acting in behalf of the plaintiff, filed an application in the United States Patent Office for a "Sprayable Water-Free Alcoholic Polyvinylpyrrolidone Hair Preparation." On January 27th, 1959, the plaintiff was granted United States Patent Letters No. 2,871,161 for that preparation. In the Patent Office proceedings Spiegel appeared as the applicant. In the proceedings in the trial court and in the briefs and arguments, the patent is frequently referred to as the Spiegel patent. For convenience in reference, the plaintiff will be considered to be the applicant for the patent and the patent will be referred to as plaintiff's patent.

The plaintiff, following March, 1952, continued to make use of the defendant, G. Barr and Company, for the packaging of its formula on an ever increasing scale. The plaintiff made use in its preparation of a hydrophobic plasticizer known as diethyl phthalate. A hydrophobic plasticizer is one that is not compatible with water. That type of plasticizer reduces the moisture sensity of the film on the hair without interfering with the removal of the film by washing.

The plaintiff, when it desired its preparation to be packaged, would send the defendant, G. Barr and Company, a supply of PVP. It used the same drums as were used by the General Aniline & Film Corporation in shipping PVP to it. Before sending the drums containing the PVP to the defendant, G. Barr and Company, the plaintiff would remove all the labels that were on the containers which indicated their contents and then identify the drums as containing "Resin LM" or "Synthetic Resin LM." The plaintiff would also send the defendant, G. Barr and Company, bottles identified as "perfume" which contained the plasticizers and perfume. The defendant, G. Barr and Company, manifested an interest in the materials being used by the plaintiff in its preparation. It early identified the plasticizer as being diethyl phthalate. The defendant, G. Barr and Company, was unable to identify the ingredient "Synthetic Resin LM" by analyses made by it and two other chemical companies. In June, 1952, one of the employees of the defendant, G. Barr and Company, noticed that one of the drums shipped by the plaintiff still bore the original identification label covered over with paint. Paint remover was applied and the label identifying the contents of the drums as PVP was exposed. Thus, since June, 1952, the defendant, G. Barr and Company, has known that the plaintiff was using PVP in its preparation. Late in 1952 the plaintiff ceased to employ the defendant, G. Barr and Company, as the loader of its preparation. Late in 1951 and early in 1952 the plaintiff, in negotiating with the General Aniline & Film Corporation for a lower price for PVP, made known to the latter that PVP was being used as a base for a hair spray.

The plaintiff, as heretofore noted, on July 31st, 1952, filed an application for a patent on its preparation in which the components of the hair spray sought to be patented were set forth. It is the practice of the Patent Office to keep applications for patents secret until final disposition, subject to being disclosed in

the case of interference proceedings. On March 27th, 1953, Anthony James Martinelli, acting for the General Aniline & Film Corporation, filed an application in the Patent Office for a patent on a hair spray preparation of a PVP type. On February 21st, 1957, the Patent Office declared an interference proceeding between the plaintiff's application and the Martinelli application. Martinelli made a motion to dissolve the interference on the ground that the invention described in both applications was unpatentable over the prior art. That motion was overruled by the Patent Office and the matter was set down for hearing on the question of priority of invention. Martinelli defaulted and the Patent Office terminated the interference proceeding in favor of the plaintiff. The patent was subsequently issued to the plaintiff on January 27th, 1959.

The defendants, among other contentions, urge that the patent in suit is invalid. They contend that the claimed patent is lacking in invention over the pertinent prior art as required by Sec. 103, Title 35 U.S.C. and also that file wrapper estoppel is involved.

The patent was granted for a "Sprayable Water-Free Alcoholic Polyvinylpyrrolidone Hair Preparation." The application of the plaintiff as it appears in the patent contains a number of statements. Among those statements are the following:

"This invention relates to a hair styling composition and more particularly to a composition for application to the surface of hair which will give it luster and retain it in the desired set, and to a method of preparation thereof.

"Prior to my discovery, many preparations have been proposed for setting the hair and for causing the hair to have a desired degree of luster or brilliance. One class of preparations which have been extensively used are those containing gums such as tragacanth or karaya, which are suspended in a colloidal water solution and applied to the hair with combing and brushing. The hair is then formed in the desired style and upon drying retains the set. The composition, however, must then be brushed and combed from the hair since it has a dry and dull appearance and cracks and breaks when disturbed.

"Another class of hair styling preparations includes the lacquers, principally shellac solutions, which are combed or applied to the surface of the hair which has been preformed to the required style and which lacquer will dry to a hard surface film which gives the hair a sculptural appearance. The hair has a high degree of luster but again cannot be disturbed without cracking and breaking the film. Furthermore, the lacquers may be insoluble in water and require considerable combing and brushing together with washing or other chemical treatment to remove entirely the lacquer film preparatory to a new application. The use of all these previous setting compositions thus entail considerable effort in the application and removal thereof and much time is consumed in their use, especially in time required for drying the gum preparations which are placed in water suspension.

"In the course of experimentation with the view of finding a hair styling preparation which lacked either the sticky characteristics of the natural gums, or the cracking and breaking characteristics of shellac, I discovered that the compound known as polyvinylpyrrolidone would furnish a beautiful luster to hair, and also the desired styling qualities without the detrimental characteristics found in the prior art substances. Polyvinylpyrrolidone is a polymerization product of the N-vinyl pyrrolidone monomer having the following formula: * * *

"For purposes of application to the hair to produce a high luster, quick

drying film, the polymerized N-vinyl pyrrolidone may be combined in an alcoholic solution with a propellant of the class known as Freon, so as to be applied as a spray.

"An object of the invention is to provide a hair setting composition embodying a polymerization product of N-vinyl pyrrolidone that may be easily and quickly applied to the hair by combining said material in a solution with mutually compatible substances that will permit application to the hair by spraying.

"Another object is to be able to provide controlled flexibility of the film by combining a plasticizer with the other materials forming the composition.

"In order to apply the film of polymerized N-vinyl pyrrolidone to the surface of the hair and achieve the desired results in a short time, I may dissolve the product in a quick drying solvent, such as ethyl alcohol. Since polymerized N-vinyl pyrrolidone is soluble in both alcohol and water, it is not critical if there is a negligible quantity of water present in the alcohol. However, where my hair styling composition is to be used in a spray-type container having self-generated pressure, I have found that it is possible to use an alcoholic solution of the polymerized N-vinyl pyrrolidone with dichlorodifluoromethane (or related compounds and mixtures thereof commonly known in the trade as Freon) as the propellant.

\* \* \* \* \* \*

"I achieve a still further advantage with my unusual hair styling composition by not only furnishing a film with a useful flexibility, but may even further control the plasticity or flexibility of the film to suit individual tastes by the addition of a plasticizer. Thus, by adding a small amount of di-ethyl phthalate, normally in the order of ⅜ of 1 percent, I can materially increase the flexibility or plasticity of the applied

film. It is, of course, not desirable to make the film so pliable as not to function properly in setting the hair. The amount of di-ethyl phthalate above mentioned will give a very good quality of flexibility to the hair under average conditions. Where a stiffer film is desired as will more nearly approach the lacquer type of appearance, the di-ethyl phthalate may be omitted. Where the opposite result is desired the diethyl phthalate content may be accordingly increased.

\* \* \* \* \* \*

"Of the solvents tried, I prefer alcohols and particularly ethyl alcohol. Where my method of preparation is for the purpose of obtaining a self-propelling composition, I mix mutually the polyvinylpyrrolidone with absolute alcohol and dichlorodifluoromethane. \* \* \*

"It may thus be seen that I have provided a hair styling composition having unusual properties in lusterizing and setting the hair which may be quickly and easily applied and yet which may be quickly and easily removed, the composition being both water soluble and alcohol soluble, and additionally soluble in the self generating propellant, dichlorodifluoromethane, when mutually dissolved in the anhydrous alcohol. \* \* \* "

There are nine claims set forth in the patent. The trial court found that claim 8 was a typical claim and it is not contended by any of the parties that such is not the case. Claim 8 reads as follows:

"A sprayable hair-preparation, comprising a substantially water-free alcoholic solution of polyvinylpyrrolidone and Freon."

It is well settled that the claims in a patent are the measure of the patentee's rights. Such claims are to be read and interpreted in the light of any claims that were rejected or withdrawn. Rota-Cara Corp. v. Frye Manufacturing Co. (D.C.1961), 197 F.Supp. 54, 60. The plaintiff's patent application travelled a

long, tortuous and troublesome path before it reached the goal of an issued patent. There were repeated rejections of claims by the examiner, following which the plaintiff would amend certain claims, cancel certain other claims, and then in many instances reassert, in substance, claims which had been rejected or cancelled. The application originally contained twelve claims. On April 10th, 1953, an examiner made his first report on the application. The examiner cited and referred to prior patents of Luckenbach, Bennett, Bohme and Keil and to published articles by Murat and Lesser. His report was as follows:

"All the claims are rejected as lacking invention over anyone of Luckenbach, Bohme, Keil or Bennett in view of Murat. The latter shows, page 350, the substitution of solutions of polyvinylpyrrolidone for previously used solutions of gum arabic or of polyvinyl alcohols. In view of this suggestion, invention is not seen in substituting, for the vinyl polymers and gums in the hair dressing compositions of Luckenbach, Bohme, Keil or Bennett, the polyvinylpyrrolidone of Murat. Bennett, page 2, column 1, shows the inclusion of a plasticizer for the resinous hair-setting preparation, so that the feature of claims 6 and 7 of including a plasticizing agent is not seen as dependable upon for spelling out invention.

"The feature of claims 5, 9 and 12 of including a Freon propellant is not seen as inventive, in view of Lesser (especially page 472)."

In response to the rejection by the examiner of its previous claims, the plaintiff on October 9th, 1953, filed an amended application. In the amended application it cancelled claims 1, 11 and 12 of its previous application and added claims 13 and 14. Cancelled claim 12 read as follows:

"The method of preparing a hair setting and lusterizing composition which consists in dissolving poly-vinylpyrrolidone in a quick drying and self-propelling solution having absolute ethyl alcohol and dichlorodifluoromethane as its mutual solvents, said solution having the property of being immediately applicable to the surface of the hair for the complete finishing and styling thereof."

On December 22d, 1953, the examiner made his second report. He cited as references patents of Richards and Schildknecht and certain publications by Janistyn, Iddings, Cooper and Fulton and an article entitled "PVP," published by the General Aniline & Film Corporation. Janistyn was a German scientist who in 1950 had published a two-volume work entitled, "Reichntoffe, Seifen, Kosmetika," which, among other teachings, taught the use of PVP as a hair dressing. The examiner's report, in part, was as follows:

"All the claims are rejected as lacking invention over Janistyn, who shows the allegedly inventive concept. Note particularly page 256 (Vol. I) of Janistyn, for the employment of 'Luviskol' as a hair-fixative, the entry also teaching that a glass-clear, hard film is formed on drying from an aqueous solution. See also, at page 159 (Vol. II) of Janistyn, the listing of 'Luviskol' as an equivalent of or alternative for natural gums and polyvinyl * * * and the like resins, for hair-fixative or wave-set purposes. Since applicant's polyvinylpyrrolidone is the same as the Janistyn 'Luviskol', invention is not seen in applicant's claims over Janistyn. Attention is also directed in Vol II to the required maintenance of placticity [sic] (muss weich * * * bleiben) and the suggested additives of page 160 and at page 164 the inclusion of a plasticizer (Weichmacher).

"The feature of the claims of including a plasticizer for the polyvinyl resin is additionally considered uninventive in view of either of Richards or Schildknecht. In Rich-

ards, note page 2, column 1 for the inclusion of a plasticizer in a polyvinyl resin aerosol composition for plasticizing the resulting film. See, also, Schildknecht, column 5, lines 58–61, for the obviousness of including with polyvinylpyrrolidone resins, plasticizers and solvents. It is clear that these are obvious expedients and cannot be relied upon as spelling out invention.

"All the claims are additionally rejected as lacking invention over anyone of Luckenbach, Bohme, Keil or Bennett in view of Janistyn. The latter, at page 159 (Vol. II) shows the substitution of polyvinylpyrrolidone for previously used gum arabic, polyvinyl alcohol, and the like hair-fixatives of the primary references. Luckenbach and Janistyn teach the spraying of the fixative compositions onto the hair, and Bennett teaches the inclusion of a suitable plasticizer for the resulting resin. These features, accordingly, cannot be relied upon for invention, being obvious.

"Lesser, Iddings, Cooper and Fulton further show as obvious the disclosed details of spray-application of the involved compositions. All the claims are additionally rejected as lacking invention over anyone of Janistyn, Luckenbach, Bohme, Keil or Bennett in view of anyone of Richards, Schildknecht, Lesser, Iddings, Cooper or Fulton, whose teachings are discussed above.

"Claim 2 is additionally rejected as being fully anticipated by Janistyn (page 256, Vol. I).

"Claims 2, 6 and 10 are further rejected as being fully anticipated by Schildknecht. In re Thuau, 554 O.G. 14.

"Claims 2, 3, 4, 8 and 10 are rejected as being fully anticipated by 'PVP', especially at pages 112–113.

"All the claims are additionally rejected as lacking invention over 'PVP', which shows polyvinylpyrrolidone applied in aerosol form (see especially pages 141, 142 and 146). To employ conventional aerosol generators and solvents for the use shown in Janistyn is not seen to involve invention."

In response to the second report of the examiner, the plaintiff on June 21st, 1954, further amended its application. In that amendment it cancelled claims 2, 4, 6, 10, 13 and 14. It amended a number of the other claims and added claims 15 and 16. Cancelled claim 14 read as follows:

"The process of preparing and applying a hair setting and lusterizing composition which comprises dissolving polyvinylpyrrolidone in a quick drying solvent such as ethyl alcohol and dichlorodifluoromethane, and spray applying the solution in finely divided state so as to cast a film upon the hair."

On March 9th, 1956, the plaintiff further amended a number of the claims and added claim 17. On March 30th, 1956, the examiner rejected all claims and added "A definite issue being reached, this rejection is made *FINAL*". However, the rejection was not final. On May 29th, 1956, the plaintiff made an application for the withdrawal of the final rejection, which was granted. In connection with that application, the plaintiff further amended its claims in a number of particulars. In the amendment it cancelled claims 9 and 16 and added claim 18. Claim 18 was as follows:

"A substantially water free hair styling composition for spray application for setting and lusterizing the hair comprising from 4% to 8% of polyvinylpyrrolidone in solution in absolute ethyl alcohol and, as a propellant, dichlorodifluoromethane."

On June 26th, 1956, the examiner determined that claims 5, 7 and 15 were allowable. He stated with some corrections claim 18 would be allowable. On August 20th, 1956, the plaintiff, by amendment, made some changes in claims 17 and 18. On August 28th, 1956, the examiner ruled that all claims still in the case were allowable. In connection with that ruling

the examiner suggested that because of the interference matter the applicant make the following claim:

"A sprayable hair-preparation comprising a substantially water-free alcoholic solution of polyvinylpyrrolidone and Freon."

The plaintiff amended its application to make the suggested claim. That claim appears as claim 8 of the patent in suit and, as heretofore noted, is typical of all of the claims in the patent.

It was heretofore noted that the defendants raised the issue of file wrapper estoppel. That rule is, in substance, that a patentee who has a claim rejected by the Patent Office and who acquiesces in that rejection may not thereafter claim the benefit of the rejected claim. Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co. (1894), 152 U.S. 425, 429, 14 S.Ct. 627, 38 L.Ed. 500. In the Patent Office proceedings that office rejected claims which might have been construed as claiming the use of a plasticizer or the use of Freon constituted invention. The plaintiff does not now claim that the use of a plasticizer or the use of Freon constituted invention. What it does now claim as constituting the invention is what is set forth in present claim 8. It appears that while the Patent Office time and again rejected claims which apparently were not substantially different from claim 8 and the other similar claims in the present patent, it finally did allow such claims. In other words, while the plaintiff's present claims were repeatedly rejected by the Patent Office the plaintiff did not acquiesce in such rejections but by repeated amendments kept asserting those claims and finally prevailed. Therefore, it cannot be said that the plaintiff is estopped from claiming invention based on claim 8 and similar claims.

Section 282, Title 35 U.S.C. provides, in part, as follows:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it. * * *"

That presumption of validity is entitled to great weight where it appears that the Patent Office gave careful consideration to the applicable prior art. See cases cited by the trial court. 190 F.Supp. 771, 780. The presumption of validity is weakened if there is applicable prior art not considered by the Patent Office. See Holstensson v. V-M Corp. (D.C.1961), 198 F.Supp. 779, 784, and cases therein cited. An applicant for a patent is presumed to know of and is chargeable with knowledge of everything in the prior art in the field in which he is working and also of all devices in that field which have been in prior public use. Landis Mach. Co. v. Parker-Kalon Corp. (2d Cir. 1951), 190 F.2d 543, 546; Zephyr American Corp. v. Bates Mfg. Co. (3d Cir. 1942), 128 F.2d 380, 385.

The defendants contend that there was certain applicable prior art which was not before the Patent Office in its consideration of the claims. Prior to the entrance of the plaintiff into this particular field, the defendant, G. Barr and Company, had been engaged in the packaging of hair sprays for manufacturers of cosmetics. Among others it was packaging a hair spray composition known as Liquinet for Raymond Laboratories. That composition consisted of Elastolac, anhydrous ethyl alcohol and Freon. Elastolac was a shellac resin. The defendants pleaded those matters in their answer. At the trial, counsel for the plaintiff stated that the plaintiff conceded that prior to the time the plaintiff entered the field the defendant, G. Barr and Company, had packaged a hair spray in aerosol form in which shellac was the resin and anhydrous alcohol and Freon were employed. Shellac is a natural resin. It was described by the plaintiff's principal chemical expert witness as being a "low molecular weight polymer." The same witness testified that polyvinylpyrrolidone was a "high" polymer. It is stated by the plaintiff in its application for the patent (portions of which were heretofore set out) that shellac solutions were in use as hair lacquers. It further stated therein that while shellac solutions gave the hair

a high degree of luster they could not be disturbed without cracking and breaking the film and that, furthermore, such type of lacquer may be insoluble in water. It appears that the shellac resin in undiluted form is not compatible with Freon. Therefore, in packaging the composition the defendant, G. Barr and Company, first dissolved the resin ingredient in anhydrous alcohol. It was then loaded into cans containing Freon. It does not appear that it was made known to the Patent Office that prior to the plaintiff's entrance into the field a composition containing the ingredients of shellac resin, anhydrous alcohol and Freon was being manufactured and sold to retailers and the general public.

The principal question presented is what invention, if any, the plaintiff did make. The answer to that question depends upon the construction of claim 8 in light of the applicable prior art. The plaintiff does not now claim that the use of a plasticizer in a hair preparation involves invention. It does not now claim that the use of Freon to propel the preparation would involve invention. The defendants assert that it is unclear and uncertain as to what the plaintiff now claims in regard to the matter of invention. The long and tortuous course of the plaintiff's application through the Patent Office has created some lack of clarity as to that matter. In its last brief and argument filed herein, the plaintiff proceeded to summarize the proceedings in the Patent Office and to explain what issues were presented to and decided by that office. In that summary and explanation, the General Aniline & Film Corporation is referred to as GAF. In its summary and explanation, the plaintiff stated, in part:

"Spiegel made three discoveries, as follows:

"1. Most broadly, he discovered that a PVP film can be used as a hair lacquer. We shall refer to this as the 'general discovery.'

"2. More specifically, he discovered that a PVP film deposited on the hair from a substantially water-free alcoholic solution produces a superior hair lacquer. We shall refer to this as the 'water-free alcohol discovery.'

"3. Still more specifically, he discovered that a combination in solution of PVP, substantially water-free alcohol and Freon is compatible. We shall refer to this as the 'compatibility discovery.'

"The water-free alcohol discovery was less broad than the general discovery because the water-free alcohol discovery was limited to water-free alcohol as a solvent whereas the general discovery was not. Similarly, the compatibility discovery was less broad than the water-free alcohol discovery because the compatibility discovery was limited to solutions with Freon whereas the water-free alcohol discovery was not.

"Thinking that he was the first to make each of these discoveries, Spiegel filed his initial patent application describing the invention broadly as well as specifically, and including broad as well as specific claims * * *. This is the ordinary practice in the filing of patent applications * * *.

"When the examiner found the German Janistyn reference * * *, Spiegel learned that his general discovery was anticipated, because PVP was included on a list of 30 substances usable as hair fixatives from water solution * * *. Spiegel thereupon dropped his broad claims to the general discovery, limited his remaining claims to the combination in solution of PVP, water-free alcohol and Freon, and amended his specification to conform with the limited claims * * *. With his claims so limited, Spiegel contended that he had made a patentable invention, both upon the broader ground of his water-free alcohol discovery and upon the narrower ground of his compatibility discovery * * *. After various technicalities were at-

tended to, the Patent Office found the Spiegel claims to be allowable and declared the interference between Spiegel and Martinelli.

"GAF called to the attention of the Patent Office the fact that PVP had been known as a hair preparation in water solution since 1948 * * *, that aerosol products, including various kinds of aerosol hair sprays, were known * * *, and that alcohol had been used as a mutual solvent in aerosol products * * *. Of course, the Patent Office also knew from Spiegel's own patent application that lacquers such as shellac had been 'combed or applied to the surface of the hair' * * *. On the other hand, a myriad of known hair fixative materials are not compatible with Freon even in the presence of alcohol, and nothing in the prior art suggested that any hair fixative material soluble in both alcohol and water should preferably be applied to the hair from a water-free alcoholic solution * * *. Finding that PVP was not analogous to any material previously known to be compatible with alcohol and Freon, the Patent Office held that Spiegel's compatibility discovery sustained the patentability of the invention * *, and also referred to Spiegel's broader argument in pointing out that GAF's principal reference did not teach 'the application of a sprayable alcoholic PVP solution on human hair' * * *."

In the portion of the summary above set forth, the Court has omitted the citations to the record made by the plaintiff therein.

It is clear that the plaintiff now relies for invention upon what it refers to as the "water-free discovery" and upon what it refers to as the "compatibility discovery," i. e., the compatibility of PVP, water-free alcohol and Freon. The view of the trial court as to the matter of invention was stated as follows (190 F. Supp. at page 781):

"In essence, Spiegel's invention was of the compatibility of Freon, alcohol and PVP, and of the application of PVP to the hair from a substantially water-free alcohol solution."

The trial court further stated (190 F. Supp. at page 782):

"The validity of the patent is strongly supported by Dr. Mark [an expert witness for the plaintiff], who concluded that Spiegel's invention was novel and that its novelty consisted principally in the compatibility of Freon, alcohol and PVP. * *"

The application originally filed in the Patent Office contained this statement:

"Since polyvinylpyrrolidone is soluble in both alcohol and water, it is not critical in this instance whether or not there is water present in the alcohol. The quality of the film formed, I have found, is equally good in either case, the limiting factor being the quickness of drying which, of course, will be delayed the greater the amount of water present. I thus prefer to use an alcohol and water combination in which the alcohol predominates."

When the plaintiff in the course of the proceedings before the Patent Office was confronted with the teaching of Janistyn as to the use of PVP as a hair dressing in a water solution, it amended its application in regard to the matter of water so that instead of reading as above set forth it read as follows:

"Since polymerized N-vinyl pyrrolidone is soluble in both alcohol and water, it is not critical if there is a negligible quantity of water present in the alcohol."

It presently reads this way in the application set forth in the patent. While the plaintiff's apparent change of front would probably not amount to file wrapper estoppel, it would seem to throw some light on the question of whether the absence of water constituted invention as now claimed by the plaintiff.

In neither claim 8 nor in any of the other present claims in the patent is any direct statement or reference made as to the matter of compatibility. However, reference is made to that feature in the plaintiff's statement preceding the claims. Since it is obvious that the three ingredients could not be successfully used in an aerosol type hair spray unless they were compatible it will be assumed that there inheres in claim 8 the claim of compatibility. The compatibility of PVP and alcohol had long been known. The experience of the defendant, G. Barr and Company, prior to the entry of the plaintiff into the field, had demonstrated that a resin ingredient dissolved in anhydrous alcohol was compatible with Freon. It also appears that PVP did not become compatible with Freon until after it had been dissolved in alcohol. It had been common practice to use alcohol as a solvent to render resins compatible with Freon which were otherwise incompatible with Freon.

It would seem upon final analysis that what the plaintiff did was to substitute one type of resin ingredient for another and that such an alternative had been earlier taught by Janistyn. While Janistyn recommended the use of PVP in a water solution, the fact that PVP was also soluble in alcohol was well known.

In Insulite Co. v. Reserve Supply Co. (8 Cir., 1932), 60 F.2d 433, 437, this Court stated:

"There is no invention in the mere substitution of one material for another."

Similarly, in the case of Evr-Klean Seat Pad Co. v. Firestone Tire & Rubber Co. (8 Cir., 1941), 118 F.2d 600, 602, this Court stated:

"There is, of course, no invention in simply substituting one material for another in a manufactured product, in order to obtain the benefit therein of some of its known, superior qualities or characteristics."

Polyvinylpyrrolidone, anhydrous alcohol and Freon were old and well-known elements. The plaintiff combined these three elements. The prior art disclosed that they were subject to being combined. In this connection Judge Learned Hand observed in the case of Ruben Condenser Co. v. Copeland Refrigeration Corp. (2d Cir. 1936), 85 F.2d 537, 541:

"We do not of course forget that it is always the combination which counts, and that no patents, or almost none, are made from new elements. But all new combinations are not patentable combinations. Especially in chemical and electrical experiments happy solutions may be reached by testing out variants reached merely by permutations of old elements. Possibly the patent law should protect such industrial achievements, but it does not; the work of the well-equipped laboratory which by trial and error checks off a series of formulas, may be the proper path of industrial advance, as the Germans found it to be before the Great War; but it does not demand what we call 'invention.' "

■ It is the holding of this Court that the plaintiff's patent is invalid in that it is lacking in invention and that the finding of the Patent Office and the finding of the trial court that the plaintiff's patent did constitute invention were clearly erroneous.

■ The plaintiff stresses the commercial success of its preparation. It appears that in 1959 the sale of PVP type hair spray was running around 100,000,000 cans per year, of which approximately 3,000,000 cans were being sold by the plaintiff. It is well settled that commercial success may not be resorted to as evidence of invention, unless that question is in doubt. Frederick Stearns & Co. v. Grove's Laboratories, Inc. (8th Cir. 1937), 87 F.2d 822, 824. However, where an invention is clearly lacking in novelty that requisite is not supplied by commercial success. Paramount Publix Corp. v. American Tri-Ergon Corp. (1935), 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997. The patent in the present case is clearly lacking in novelty. Because of the hold-

ing of the Court as to the invalidity of the patent in suit, it is not necessary to give consideration to the issue of infringement.

There remains for consideration the appeal of the plaintiff from the decision of the trial court denying its claim relating to misappropriation of a trade secret by the defendant, G. Barr and Company. The trial court held that the plaintiff had not established the asserted claim. The trial court did not specifically state the basis of that holding. In a brief of the plaintiff, it is stated that the defendant, G. Barr and Company, contended in the trial court that the disclosure made by the General Aniline & Film Corporation to the cosmetic trade constituted public disclosure and that the defendant, G. Barr and Company, as a member of the public had a right to take advantage of the disclosure. The plaintiff implies that the trial court's denial of the plaintiff's claim was based on that ground. The following portions of the memorandum opinion of the trial court (190 F.Supp. at page 773) would seem to be of pertinence in that connection. The trial court referred to the defendant, G. Barr and Company, as Barr and to the General Aniline & Film Corporation as GAF:

"On July 31, 1952, Spiegel filed his patent application. In November, 1952 plaintiff shifted his loading business from Barr to another company. Plaintiff maintains that during all of this time he kept the identity of his resin LM secret and that Barr knew that it was to be kept secret.

"Meanwhile, the plaintiff had disclosed his secret to GAF in confidence. In November of 1952 GAF, allegedly taking advantage of the confidence, started to promote the use of PVP hair sprays throughout the industry, principally through one Edwin P. Hay, a salesman. Hay then told Barr about PVP hair spray.

"It does not appear from the evidence that Barr at any time disclosed his previously acquired knowledge as to the real nature of resin LM. In December, 1952, GAF, through salesman Hay, and Barr, started the promotion of aerosol PVP hair spray using Spiegel's formula. GAF intended to sell the PVP, it being the only manufacturer of it, and Barr intended to get the loading business, it being the principal company engaged in that business. Subsequently, most of the major cosmetic companies put out PVP hair spray using, it is claimed, the Spiegel formula."

The trial court adopted its memorandum opinion as its findings of fact and conclusions of law.

The defendant, G. Barr and Company, makes a number of contentions in connection with this phase of the litigation. It urges that the use by the plaintiff of PVP in its preparation did not have the status of a trade secret. It further contends that it did not have either a confidential or fiduciary relationship with the plaintiff. The trial court did not discuss those two matters or make any particular findings in relation to them.

It seems clear that during the time the plaintiff employed the defendant, G. Barr and Company, to load its preparation it was endeavoring to keep secret the fact that it was using PVP as an ingredient in its preparation. Therefore, such use would seem to have had the status of a trade secret. It is not so clear that a confidential or fiduciary relationship existed between the defendant, G. Barr and Company, and the plaintiff. However, if it be assumed that the relationship between them was such that the defendant, G. Barr and Company, was not privileged to misappropriate the information obtained by it in connection with the loading of the cans, such assumption would not be determinative of the question here under consideration. The trial court found that the defendant, G. Barr and Company, during the period that it

was packaging plaintiff's preparation, did acquire knowledge that the plaintiff was using PVP as an ingredient in its preparation. The trial court further found that the defendant, G. Barr and Company, did not make any disclosure of that knowledge. It appears that following the time the defendant, G. Barr and Company, acquired the knowledge referred to it carried on intermittent experiments involving the use of PVP as an ingredient for hair sprays. The evidence relating to that matter was fully gone into at the trial. The trial court found that in November, 1952, the General Aniline & Film Corporation commenced the promotion of the use of PVP as an ingredient for hair sprays and imparted information as to such use to the cosmetic trade in general and that thereafter the defendant, G. Barr and Company, sought to secure loading business from those who were marketing PVP type hair sprays. It would seem that it was the finding of the trial court that the defendant, G. Barr and Company, did not load or otherwise process hair sprays containing PVP as an ingredient until after the General Aniline & Film Corporation had promoted such use generally throughout the cosmetic trade. It would also seem that the trial court considered that at the time the defendant, G. Barr and Company, started loading or processing hair sprays having PVP as an ingredient it made use of what was then public information and that as a member of the public it had the right to make use of such information. The findings of the trial court referred to have substantial support in the evidence. Under that factual situation, the trial court was clearly correct in denying the claim of the plaintiff based on a misappropriation of a trade secret. The plaintiff in this connection cites and relies upon the case Grepke v. General Electric Co., (7th Cir. 1960), 280 F.2d 508, cert. denied (1960), 364 U.S. 899, 81 S.Ct. 232, 5 L.Ed.2d 193. This Court has given consideration to that case but does not regard the holding in that case as being controlling or persuasive herein.

The defendant, G. Barr and Company, in its answer, raised the defense that the plaintiff's claim for misappropriation of a trade secret was barred by a Minnesota statute of limitation. The trial court did not pass on that question and that question is not reached here.

That portion of the judgment appealed from which adjudged the patent in question to be valid and infringed is reversed.

That portion of the judgment appealed from which denied the claim for misappropriation of a trade secret is affirmed.