LA MAUR, INC., Plaintiff, Counter-Defendant,

v.

DeMERT & DOUGHERTY, INC., and Aeropak N. J. Incorporated, Defendants, Counter-Plaintiff.

No. 62 C 1972.

United States District Court
N. D. Illinois, E. D.
Nov. 23, 1965.

Leonard, Street & Deinard, Minneapolis, Minn., Bair, Freeman, & Molinaire, Chicago, Ill., of counsel, for plaintiff.

R. Howard Goldsmith, Ernest Cheslow, Chicago, Ill., for defendants.

## SUMMARY

## MEMORANDUM OPINION

MAROVITZ, District Judge.

After extensive review of the cumbersome briefs and records herein, I have concluded, as did the Eighth Circuit, that the Spiegel Patent is invalid. I am unable to accept plaintiff's major theory that the functions of setting lotions and hair sprays are so divergent as to make plaintiff's "invention" a sufficient advance over the prior art as developed in the Janistyn reference. That is, Janistyn's water-PVP combination appears to leave an identical water-soluble film on a subject's hair, and should not, via plaintiff's semantic tricks, be classified as a different animal. The evidence demonstrated to my satisfaction that Spiegel's choice of alcohol, rather than water, was dictated by the demands of the aerosol industry, (i. e. water is not miscible with Freon 12 and PVP) rather than by a momentous "discovery" that alcohol inherently has superior qualities in the hair spray field. This is further evidenced by plaintiff's use of water in purse-size containers because alcohol alone would have a deleterious effect on such a container, and by testimony indicating that Spiegel attempted to make a hair-spray with water until the aerosol filling company (Barr) advised him of their requirements.

I am further satisfied that the PVP-Alcohol-Freon combination was fully anticipated by the flood of resin combinations discussed at trial which preceded it. Spiegel did no more than substitute PVP, a known hair fixative, for shellac. This was too obvious to be considered inventive, and indeed, probably would have been tried before if the price of PVP at that time was not prohibitive.

Accordingly, for this and other reasons developed in the Findings and Conclusions (i. e. 1958 amendment based on new matter, failure of Spiegel to disclose prior art; claims too broad, etc.) I have decided to hold for defendant.

The Findings and Conclusions are drawn in the main from those submitted by the parties, primarily defendant. I have, however, deleted some fifty of defendant's suggestions which I felt were not justified or not necessary, altered others, and added a few myself.

Despite defendant's protestations of fraud etc., I do not think that plaintiff need bear the burden of paying defendant's counsel fees merely because they lost. The Section allowing such payment is remedial, not penal, as detailed in Conclusions, 23–25, and as long as the law permits plaintiff to seek a favorable ruling in each Circuit, I see no reason to penalize them. The fault in my judgment is in the law, not with plaintiff.

For Decision.

The above-entitled matter having duly come for trial before this Court on April

19, 1965 to May 25, 1965 at Chicago, Illinois, and said Court having considered the evidence, and being duly advised in the premises, hereby makes the following *Findings of Fact* and *Conclusions of Law*:

## FINDINGS OF FACT

1. This is an action for infringement of plaintiff's United States Letters Patent Reissue No. 25,022, issued on August 8, 1961. The patent is a reissue of United States Letters Patent No. 2,871,161, issued on January 27, 1959 upon an application filed July 31, 1952. This action arises under the patent laws of the United States, and jurisdiction of this Court is based upon Title 28, Section 1338 of the United States Code.

2. La Maur is a Minnesota Corporation with its principal place of business in Minneapolis, Minnesota and is engaged in the manufacture and sale of cosmetic products, including aerosol hair sprays (Complaint and Answer, Par. 1); its first sale of an aerosol hair spray was in March, 1952 (1840–1).

3. The Patentee, Mr. Maurice Spiegel, is the President of La Maur, (P. 1789).

4. Defendant DeMert & Dougherty (hereinafter "D & D") is an Illinois corporation having its principal place of business in Chicago, Illinois. One of its divisions is engaged in the manufacture of aerosol hair sprays (Complaint and Answer, Par. 2; 2539–40). D & D was the first commercial aerosol filler in the City of Chicago, commencing in 1948 (2540–1).

5. Defendant Aeropak N. J. is a New Jersey corporation, an extension of the original D & D operation (Complaint and Answer, Par. 3; 2540). Aeropak N. J. was not named as a defendant in the patent count, the only count of the complaint involved herein and hence will not be referred to hereinafter.

6. La Maur is the owner of the patent and has been the owner since its issuance (Pretrial Stip.).

7. All claims of the patent have been charged to be infringed (Pretrial Stip.).

8. The trial was extensive, commencing on April 19, 1965 and concluding on May 26, 1965. The transcript of the record is in excess of 4200 pages. There were over 250 exhibits introduced, many of them consisting of numerous pages. An important aspect of the evidence consisted of demonstrations observed by the Court.

9. The testimony having been conflicting and cumbersome throughout, the Court should note that the following Findings are a result of careful consideration of the most credible evidence, and evaluation of courtroom demonstrations. These Findings are in large measure predicated upon observation of the witnesses and consideration of their demeanor and credibility.

10. The patent in suit relates to an aerosol hair spray composed essentially of Freon, substantially water-free alcohol and polyvinylpyrrolidone (hereinafter for brevity "PVP"), and to the process of applying substantially water-free alcoholic solutions of PVP to the hair for cosmetic effect. The original patent contained nine claims of which Claim 8, reading as follows, is illustrative:

> "A sprayable hair preparation, comprising a substantially water-free alcoholic solution of polyvinylpyrrolidone Freon."

The nine claims of the original patent were all carried over to the reissue patent, which added two process claims.

11. The subject hair preparation has as its film-forming ingredient a substance known as polyvinylpyrrolidone which is a polymer, i. e. it is a chain composed of many units of a material known as N-vinyl pyrrolidone having a structural formula shown in column 1 and Claims 9 and 11 of the patent. This substance is commonly known and referred to as PVP and will so be referred to throughout these Findings, PVP was known, as were its properties of both water and alcohol solubility. As set forth in greater de-

tail below, PVP was also recommended for use as a film-forming ingredient in hair preparations prior to the alleged invention of Mr. Spiegel.

12. The patent states in its opening paragraph that the "invention" relates to a hair styling composition for application to the surface of the hair to retain the hair in the desired set. The second and third paragraphs describe compositions used in the past to set hair, one class being the gums in colloidal water solutions applied by combing or brushing and another class being the lacquers, principally shellac solutions. Paragraph three mentions disadvantages of both classes of prior preparations; regarding the lacquers it says that they tend to crack and break after they have been combed or applied to the finished coiffure and they are also difficult to remove by washing since they "may be insoluble in water." The patent then asserts that the patentee discovered that PVP furnishes the desired styling qualities "without the detrimental characteristics found in (both classes of) the prior art substances." Reference is then made to PVP compositions for the hair including using PVP in "a spray-type container having self-generated pressure" (an aerosol). Such an aerosol contains PVP in anhydrous (absolute or 200 proof) alcohol together with a propellant of the class sold under the trademark "Freon." Other details are then set forth.

13. Freon is the generic trademark for a class of materials which are hydrocarbons (methanes and ethanes) containing chlorine and fluorine (349, 754). Claims 1, 4 and 6 refer to the Freon class by a broad chemical definition— "a propellant selected from the group consisting of flurochloromethanes and fluorochloroethanes"; Claims 2, 3, 5 and 7 refer to the specific Freon dichlorodifluoromethane, hereinafter called Freon 12 (749); and Claims 8 and 9 refer to the propellants by the trademark "Freon." The only specific Freon mentioned in the patent is Freon 12 (749–55).

14. The first nine claims of the patent are the same as the first nine claims of the original and all refer to PVP aerosols. The broadest claim, 8, reads:

"8. A sprayable hair-preparation, comprising a substantially water-free alcoholic solution of PVP and Freon."

15. The two claims added by reissue (10 and 11) are broader than the original nine claims in that they are broad enough to encompass aerosol application, but they are not restricted to aerosol application, i. e. they do not require a propellant. Claim 10 reads:

"10. A process of holding and lusterizing human hair for cosmetic effect, comprising applying to the hair a substantially water-free alcoholic solution of PVP."

16. All of the claims refer to compositions which are "substantially water-free." Claims 1 and 6 speak of "alcohol"; Claims 2 and 7 refer to "absolute ethyl alcohol"; Claims 3, 4 and 5 recite "ethyl alcohol"; and Claims 8, 9, 10 and 11 specify an "alcoholic solution."

17. In the claims where function is mentioned, Claims 1, 2, 3, 4, 6 and 7 refer to a composition for "setting" the hair whereas Claims 10 and 11 refer to a process involving "holding" the hair. "Setting" has the same meaning as "holding" (2177–8).

18. Although Claims 10 and 11 relate to a process rather than a composition, the essential feature of alleged novelty lies in the composition in that the process claims require the application to the hair of a substantially water-free alcoholic solution of PVP (2171–2; 3343).

19. The file histories of the original patent and the reissue are of importance in understanding the alleged invention, the changes that took place in connection with the prosecution of the original patent and its reissue, and the meaning of many of the terms appearing in the patent. Findings below discuss in detail various aspects of the file histories. A substantial portion of the trial was involved in connection with testimony ex-

plaining and purporting to explain the meaning of the file histories.

20. The original patent was held invalid in L. S. Donaldson Co. and G. Barr and Co. v. La Maur, Inc., 299 F.2d 412 (8th Cir., 1962) (hereinafter called the "Barr" suit). The original patent was held invalid in the Barr suit because it was obvious to use PVP in a hair spray with anhydrous alcohol and a Freon propellant in view of the facts (established also in this record) that (1) Janistyn (PX 15, item 11 and PX 17) taught use of PVP as a hair fixative, (2) prior to the time of Mr. Spiegel's alleged invention, aerosol hair sprays had been marketed which contained shellac (as the resin or film forming ingredient) with anhydrous alcohol and Freon, and (3) PVP was known to be both alcohol soluble and water soluble. As concluded by the Court (299 F.2d at 423):

"It would seem upon final analysis that what the plaintiff did was to substitute one type of resin ingredient for another and that such an alternative had been earlier taught by Janistyn. While Janistyn recommended the use of PVP in a water solution, the fact that PVP was also soluble in alcohol was well known."

21. We find the same facts upon which the holding of obviousness was predicated in the Barr case to be present in the record before us. While La Maur introduced much testimony setting forth new theories of invention which were not before the Court in the Barr litigation insofar as the opinions of the District Court (190 F.Supp. 771) and the Court of Appeals reveal, we do not find that sufficient new credible factual evidence has been brought forth to rebut that decision.

22. The Barr suit referred to the failure of La Maur to disclose to the Patent Office the existence of prior aerosol hair sprays containing shellac, anhydrous alcohol and Freon, but the Court did not rest its decision of invalidity on this point; here however, as set forth in Findings below, substantial evidence was introduced to indicate that this is a basis for unenforceability of the patent because there was a duty to disclose such prior art and it was not disclosed.

The Barr suit also made reference to "plaintiff's apparent change of front," involving a 1958 amendment to the application as originally filed in 1952 (DX 4, pp. 95–8). The original application stated that it was not critical whether or not there was water present in the alcohol; in 1958 this language was changed to read that it was not critical if a "negligible" quantity of water was present in the alcohol. The Barr case did not reach a conclusion of invalidity resulting from this "change of front"; the credible evidence here as set forth in Findings below however, established that the 1958 amendment resulted in the addition of new matter.

23. In the Barr suit La Maur asserted in a brief filed in the Court of Appeals that there were initially 3 discoveries—(1) a "general discovery" involving the use of a PVP film as a "hair lacquer"; (2) an alleged "water-free alcohol discovery" that a PVP film deposited on the hair from a substantially water-free alcohol solution produced a superior "hair lacquer" and (3) a "compatibility discovery" relating to the miscibility of PVP, substantially water-free alcohol and Freon. In the Barr suit La Maur admitted that the "general discovery" of a PVP "hair lacquer" was anticipated by PVP as a hair fixative in water solution (Janistyn), leaving only the more limited "discoveries" of a "hair lacquer" as contained in the "water-free alcohol discovery" and the "compatibility discovery." It was established here that the statements and admissions made in the Barr suit were a fair summary of Mr. Spiegel's "discoveries" and that these were his only "discoveries" (DX 20; 2282–4).

24. The Court here finds, based upon the specific facts set forth in Findings below (1) that the alleged "water-free alcohol discovery" was obvious to a person having ordinary skill in the art and (2) that the alleged "compatibility dis-

covery" was obvious to a person having ordinary skill in the art.

25. The aerosol industry was created after the second world war as a result of availability of Freon propellants and the work of the can companies in developing a low pressure aerosol can (353–7; 955–6; 1939–41). The aerosol industry made it possible to package a multitude of products in aerosol containers, including hair sprays; it was the aerosol industry that created a new commodity (957–8; 1939–41).

26. The first aerosol hair spray was a product known as "Liquinet" (319–20; 2732) which was marketed in 1949 (2765; DX 22A–D). The Liquinet product (made of shellac, anhydrous alcohol and Freon (2072)) was a good product (320–1) and it was not only carefully watched by the industry, but it was copied by such important companies in the beauty industry as Helene Curtis and Rayette (958–9). Mr. Spiegel was aware of the existence of Liquinet at least as early as 1950, and was also aware that it was a shellac base product because he analyzed it (DX 3A, p. 29–30). Mr. Spiegel also knew that thousands and thousands of cans of aerosol hair sprays containing a film-former in an anhydrous alcohol and Freon environment were being sold before he did any work in this area (1908–9; 1915–16).

27. In 1950 and 1951 Mr. Spiegel prepared a series of alcoholic resin solutions, called "concentrates," which were sent to G. Barr and Co. (a Chicago aerosol filler and defendant in the *Barr* suit—hereinafter called "Barr") for filling with Freon to make hair sprays. As the first of this series, Mr. Spiegel sought (in May of 1950) to make a copy of what he thought was the Liquinet product (1853–4; 1893; DX 43, p. 965). This attempted duplication comprised, *inter alia,* a solution of shellac in 95 per cent alcohol (1854; DX 43, p. 965); such a concentrate was sent Barr for aerosol filling on May 16, 1950 (DX 3A, p. 30–1; DX 45). Barr advised Mr. Spiegel on May 24, 1950, that his concentrate was not compatible in an aero-

sol container and therefore anhydrous alcohol was added (R. 1865–6; DX 47). Mr. Spiegel was not aware, when he prepared his concentrate in 95 per cent alcohol that anhydrous alcohol was necessary in an aerosol container (1866), although this requirement was well known by aerosol fillers, including Barr.

28. Sometime between May, 1950 and November, 1950, Mr. Spiegel learned that anhydrous alcohol was a requirement for packaging a hair spray in an aerosol container (1866); during 1950 he also learned that Liquinet contained shellac, anhydrous alcohol and Freon (2072). He additionally became aware, prior to any work with PVP, that all aerosol hair sprays then on the market employed a mixture of Freon 11 and Freon 12 as the propellant and that shellac, anhydrous alcohol and Freon in an aerosol hair spray formed a compatible (miscible) solution (1915; DX 3A 298–9). He learned that unless anhydrous alcohol was used with Freon 11 and 12 in the aerosol hair sprays then in vogue, the composition would "eat right through the can" (1856) by virtue of corrosion (1899–1902).

29. In November, 1950, Mr. Spiegel switched from 95 per cent alcohol to anhydrous alcohol; and thereafter used anhydrous alcohol as a solvent in all the concentrates he sent to Barr. At that time he made up another Liquinet copy, but this time he used anhydrous alcohol (1855, 1873; DX 43, unnumbered p. opposite p. 21, see also p. 125) and sent this concentrate to Barr for aerosol filling at that time (1871–4; DX 49, p. 5). From December 6, 1950 through April 17, 1951, Mr. Spiegel sent Barr, for pressure filling in aerosol containers with Freon 11 and Freon 12 concentrates of other hair spray material as replacements for shellac, each such material being in solution with anhydrous alcohol (1871–6; 1920–1; DX 49, p. 5).

30. The best miscibility for unknown film-formers in an aerosol was known, prior to Mr. Spiegel, to be obtained with anhydrous alcohol and Freon 11 and 12 (2771–3). Alcohol is also necessary to

make PVP compatible with Freon in an aerosol (2179; 2312–13); and such compatibility in alcohol-Freon solution makes it possible to spray PVP in solution which will form a film when sprayed (R. 2313–14). Just as in any prior art hair spray, alcohol is essential in a PVP hair spray to be able to use it in the aerosol form (2179; 2771–3).

31. On July 3, 1951, Mr. Spiegel made a solution of PVP in anhydrous alcohol (1810; DX 3A, pp. 62–3; PX 60, p. 171; DX 43, p. 171), following the pattern he had used with other concentrates and knowing that anhydrous alcohol was necessary in an aerosol (DX 3A, p. 63). The formulation was sent to Barr for aerosol filling with a letter dated July 6, 1951 (DX 44; DX 3A, pp. 63–4). Mr. Rose, who was an employee of Barr in 1951 (2731) (and who testified for La Maur as an aerosol expert), wrote in reply to the letter of July 6, 1951 (DX 44) that it was absolutely necessary to use anhydrous alcohol and anhydrous materials throughout since the presence of water would cause corrosion in the can (2770–1; DX 48).

32. When Mr. Spiegel sent PVP in anhydrous alcohol to Barr for filling in a pressurized container, it was sent to Barr and filled by Barr in exactly the same manner as the previous materials sent Barr in anhydrous alcohol between November, 1950 and April 17, 1951 (1873–7; 1920–1). Barr loaded this material in aerosol containers in exactly the same manner as Barr had previously loaded commercial aerosol hair sprays on the market prior to any work by Mr. Spiegel (1934–6). Barr employed anhydrous alcohol in packaging La Maur's commercial product "Style" in about March, 1952 (1892–3) and Style has always contained anhydrous alcohol since it was first commercially sold in 1952 (2038).

33. Even though Mr. Rose at Barr did not know that the resin was PVP at that time, the anhydrous alcohol solution of PVP was filled with Freon 11 and 12 because this was the accepted propellant for hair sprays (2771–2). If Barr had received the first sample of the unknown resin in powdered form rather than as a concentrate in anhydrous alcohol, it would have checked it for alcohol solubility, found it to be soluble in alcohol and then would have placed it in an aerosol with anhydrous alcohol, "the well known vehicle for any film former" and Freon 11 and 12 (2784–5).

34. Shellac products started the aerosol hair spray industry and also the hair fixative industry as well because shellac-alcohol solutions were used in bulb type atomizers before the aerosol came along (2779). La Maur's PVP product followed closely on the heels of other aerosol hair sprays, it being common in the cosmetic industry to follow along when an idea is created in the cosmetic business (DX 3A, p. 191).

35. It was not commercially feasible to produce a PVP hair spray in substantial quantities prior to the fall of 1952 because the price of PVP was too high for successful commercial use. At the time that Barr first experimentally packaged the PVP-anhydrous alcohol concentrate sent Barr for aerosol filling in July of 1951 (Findings 31 and 32 above), the price of PVP was about $12.00 per pound which was too high for a commercial product (1821; PX 67). Even though Style hair spray was introduced to the trade in March of 1952 (1840–1) some nine months later, the price of PVP was $6.00 per pound, a price still too high for commercial use (1925; PX 77 & 78); the product was initially sold in small quantities and it was initially a matter of business judgment whether the product would sell (DX 3A, pp. 345–6). It was not until October, 1952, seven months after La Maur had started initial production that the price of PVP was reduced to a commercially feasible figure of $3.00 per pound (1932; PX 95).

36. The Court finds from all of the evidence that Mr. Spiegel was commercially interested in only an aerosol hair spray containing PVP, anhydrous alcohol, and a Freon propellant.

37. After testing PVP in alcohol, Mr. Spiegel concluded that the aerosol principle should be employed rather than spraying, combing or dipping, since the product worked so well in high alcoholic concentrations. (DX 3A, p. 61); high alcoholic concentrations in non-aerosol compositions leach out oils and waxes and make the hair crumbly and harsh (252–3). At the time the patent application was filed in 1952, Mr. Spiegel believed that the most practical commercial hair spray was an aerosol system employing PVP and anhydrous alcohol with Freon 11 and 12 in a steel can (2310). When the application was filed, Mr. Spiegel desired to secure protection beyond what he then felt was the most practical system in the possible event that some other type of container might subsequently become practical (2310–12).

38. La Maur has never sold a substantially water-free alcoholic solution of PVP other than in an aerosol (1958) and although La Maur received requests for PVP in alcohol, La Maur refused to sell such a product (1959). When his deposition was taken in 1962, Mr. Spiegel twice stated that he considered his invention to be a hair styling composition made of PVP, substantially water-free alcohol and a propellant (DX 3A, pp. 97 & 138).

39. The prior art Janistyn reference taught the use of PVP as a "hair fixative" (PX 17, p. 9) and that it formed a film on the hair (PX 17, p. 2). The reference indicates that, "the fixative should not stick and keep the hair well and for a prolonged period in shape. The hair should show no frost and must remain soft and supple" (PX 17, p. 9). The use of PVP on the hair was also disclosed in another German reference (DX 88). It was further known prior to Mr. Spiegel that PVP was both alcohol soluble and water soluble and that it formed a film on the hair (950–1).

40. PVP forms a film to hold the hair in the same way as shellac applied to the surface of the hair which has been preformed to the required style (1975). The film formed by PVP on the hair is the same film whether it is applied to the hair from an alcohol solution or from a water solution (1165–6).

41. One of the inherent characteristics of PVP is that it is both water soluble and alcohol soluble. It is necessary to have an alcohol soluble material for aerosol since alcohol is necessary in an aerosol: and it is desirable to have a water soluble material for washability. When Mr. Zemlin of Rayette requested a material that was both water soluble and alcohol soluble in 1950 he subsequently obtained PVP (3035–7; DX 32, DX 33). Dr. Mark admitted that had he received a similar request (DX 32), he would have also recommended PVP in 1950 (1742–3).

42. La Maur produced a water soluble and water-containing product under the name "Style" in 1945 (2819; DX 1, DX 17) which was used as a lacquer on the finished coiffure (DX 3B, pp. 35–6; 2976; 2972): the label featured washability—"STYLE is water-soluble and is removed when shampooed"—and also its use as a lacquer (DX 1) and the product was used until La Maur went into the manufacture of the aerosol product (DX 3A, p. 78).

43. The inherent water solubility characteristic of PVP led to easy washability of the film forming material from the hair. One of the main criticisms of the films formed by prior shellac hair lacquer was its known difficulty of removal from the hair (patent, col. 1, lines 37–39, 42–43; 311). Janistyn also taught the advisability of having a hair lacquer that was easily removed by a normal hair wash (PX 17, p. 18). When the Style aerosol product first appeared on the market, the first label stressed the water solubility of the product (PX 19B) as does the copy on more recent containers (PX 14).

44. La Maur has asserted that the alleged invention requires the absence of water and that one would not deliberately add water to the alcohol in a PVP aerosol composition (699, 1355). Yet in a La Maur PVP aerosol product known as "Purse Size" Style, water was added to

avoid corrosion inasmuch as this product was packaged in an aluminum can (1895–99; 1906–7). There was testimony that anhydrous alcohol, undiluted by water, will attack and eat through aluminum.

45. It was known in the aerosol industry before the alleged invention that the presence of water in an aerosol container would cause a corrosion problem, and would preclude the obtaining of a compatible solution (882–4).

46. La Maur contended that there was nothing unobvious about the use of shellac, anhydrous alcohol and Freon in an aerosol (DX 3A, p. 30; 1245–6); Liquinet, the first aerosol hair spray on the market was not patented (1246).

47. It was known in 1950 that water was to be avoided if one were considering an aerosol (972).

48. It was admitted that it would be "common sense" for one having aerosol knowledge who wanted to put PVP in an aerosol, to dissolve it in anhydrous alcohol and spray it with Freon (951–4). It was admitted there would be no difficulty in putting PVP in an aerosol once a person had the idea of using PVP in a spray for the finished coiffure (973).

49. At the trial, Mr. Spiegel admitted that if one was desirous of packaging a material in an aerosol container it was "obvious" that it would be packaged in combination with Freon and anhydrous alcohol (2288–89) and La Maur's aerosol expert, Mr. Rose, agreed with this (2785–6).

50. The use of PVP in an aerosol, upon final analysis, was the substitution of one type of resin ingredient for another. Such an alternative had been earlier taught in the prior art by Janistyn who recommended the use of PVP in a water solution, although the alcohol solubility thereof was well known (1730–1).

51. La Maur's expert, Mr. Whitman, testified that the "edge of the argument" depended upon whether Mr. Spiegel got rid of the water "because he was thinking of the Freon" (972). Mr. Spiegel admitted that the necessity for employing water-free alcohol was a requirement

of aerosol packaging (2045). The patent application as filed taught that in a non-aerosol use (where there was no aerosol packaging problem) the preferred composition was an alcohol and water combination (DX 4, p. 3).

52. The alleged inventive requirement set forth in all the claims of the patent, that the PVP product be "substantially water-free," was a requirement dictated by known aerosol technology and was an obvious requirement.

53. If there is any difference in the effectiveness of PVP as a hair lacquer in water-free alcohol as against PVP in alcohol containing water, the alleged difference was admittedly one of degree (2027–8; 2105).

54. In order to ascertain the compatibility of PVP, Freon and anhydrous alcohol the obvious thing to do was to put the materials together to see if they were compatible (3905–7; DX 3A, p. 323); it was necessary to make only a single test (1916).

55. The combination of PVP, anhydrous alcohol and Freon into a compatible solution was obvious.

56. The application for patent as originally filed in 1952 stated (DX 4, p. 3):

"Since PVP is soluble in both alcohol and water, it is not critical in this instance whether or not there is water present in the alcohol. The quality of the film formed, I have found, is equally good in either case, the limiting factor being the quickness of drying which, of course, will be delayed the greater the amount of water present. I thus prefer to use an alcohol and water combination in which the alcohol predominates."

The application then continues, in the same paragraph, "Now, however, where my hair styling composition is to be used in a spray type container having self generated pressure (an aerosol with Freon) * * *," absolute alcohol is employed as the solvent for PVP with Freon because of the immiscibility of water with Freon. This language is

clear that water may be used with PVP when a non-aerosol application is employed and as taught by the prior art, anhydrous alcohol is required where the PVP is put into an aerosol container with Freon; this was admitted by the patentee (DX 3A, p. 150–2). In the non-aerosol use, where there was no aerosol packaging problem, the patentee "preferred" an "alcohol and water combination" (DX 4, p. 3).

57. In 1958, the application was amended by removing, *inter alia*, the language on page 3 of the original application (above quoted) but again stating, as found in the patent, that water is immiscible with Freon and therefore absolute or 200 proof alcohol is employed with a Freon propelled aerosol. The statement originally found in the application as filed, "Since PVP is soluble in both alcohol and water, it is not critical in this instance whether or not there is water present in the alcohol," and the further statement that the quality of the film formed is equally good in either case (relating to use other than in an aerosol) was replaced by the following:

"Since PVP is soluble in both alcohol and water, it is not critical if there is a negligible quantity of water present in the alcohol."

58. A substantial portion of the record involved much testimony concerning the meaning of the language of the application as originally filed as compared with the change that occurred some six years later. The Court finds from the most credible evidence and the clear language of the application as originally filed that the statements in that application indicate that Mr. Spiegel believed, and his alleged invention contemplated, that non-aerosol PVP compositions that contain water and non-aerosol PVP compositions which are water free were equivalent for his purposes, without any real difference in function or effectiveness.

59. The Court further finds that the 1958 amendment to the application clearly changes the stated equivalence between water-containing and water-free composi-tions and sets forth a different meaning which amounts to the addition of new matter to the application as originally filed.

60. An application for reissue of the original patent was filed on February 9, 1959 (DX 5). The reissue application contained two proposed new claims each of which referred to a substantially water-free alcoholic solution of PVP and a "propellant" (DX 5, p. 4), and an oath of Mr. Spiegel (DX 5, pp. 5–9). The oath asserted that the alleged error was that the claims were unduly restricted in that the Freon class of propellants were the only propellants covered by the original patent claims and that the patentee was entitled to use the more generic expression "a propellant" (DX 5, pp. 5–6)

61. The patentee, at the time that the reissue application was filed, regarded the presence of a propellant as essential to his broadened "invention," as is evident from statements made (in an amendment filed October 30, 1959) that, "The reissue does not seek to change the patent to cover other than a sprayable hair preparation" (DX 5, p. 30) and that "the invention requires the disclosure of some means for propelling the hair styling composition" (DX 5, p. 34).

62. On February 14, 1961, more than two years after the original patent had issued, the reissue application was amended to present two new claims which eventually became reissue patent claims 10 and 11 (DX 5, p. 58). The amendment was accompanied by an affidavit by Dr. Mark asserting an allegedly unexpected result in increased "affinity" in PVP films deposited from alcoholic solutions. It was stated that the prior failure to urge such claims arose "through the lack of understanding or knowledge of the scientific theory of the broader invention (as asserted in Dr. Mark's affidavit) by applicant and by his counsel" (DX 5, p. 63) and that Dr. Mark's work justified the broadening (4026).

63. The submission of the amended reissue claims was predicated upon a

newly alleged "error" (the failure to appreciate Dr. Mark's "new" scientific theory) rather than the originally asserted "error" (the failure to claim propellants broadly). The Court finds that there is no proper reissue oath specifying the errors relied upon with respect to the reissue claims of the patent since the original reissue oath made no reference to Dr. Mark's scientific theory and the final reissue claims were predicated on this theory.

64. The reissue claims originally sought were broader than the claims of the original patent. The reissue claims eventually granted were broader than the reissue claims originally sought and constituted a second broadening of the original patent claims. The second broadening took place more than two years after the original patent had issued (DX 5, pp. 58–63, 4026).

65. The reissue claims are of sufficient breadth to include aerosol application (of "substantially water-free" PVP solutions) as well as application of such solutions by some other method. The subject matter of Claims 10 and 11 is obvious for the same reasons that original Claims 1–9 are obvious.

66. The only grounds for patentability of the reissue which were urged during the prosecution of the reissue application with regard to the asserted advantage of "substantially water-free alcohol" were increased "luster" and "affinity" allegedly obtained when "substantially water-free alcohol" is used with PVP. Neither increased luster nor increased affinity are referred to in the application as filed or the patent as originally issued or reissued. The application as originally filed denies the existence of any difference in either luster or affinity when it states that the quality of the film formed in either case (whether water is present or not) is the same. The patent as issued also denies any difference in either luster or affinity by stating that when the hair to which PVP has been applied is re-wetted with water (to dissolve the PVP and thus reapply PVP from water solution), this "will again leave the film in its lustrous condition with the desired setting property" and also that "the hair will immediately resume its set and luster" (col. 2, line 70 to col. 3, line 6).

67. The allowance of the reissue claims was predicated upon the affidavit of Dr. Mark which accompanied the amendment of February 14, 1961 (4026). The affidavit asserts in paragraph 5, "One of the important attributes of any hair spray is its affinity for the hair" (DX 5, p. 66). Yet Dr. Mark stated that at that time he was unaware of the practical significance of increased affinity in a hair spray (1658).

68. As stated in Findings above, the application as originally filed in 1952 set forth a non-aerosol use of PVP compositions wherein water could be either present or absent. There is no basis in the application as filed for the term "substantially water-free" in reissue Claims 10 and 11 since these claims are broad enough to include non-aerosol application of PVP compositions. The application as filed specifically states that such compositions can employ water.

69. The only "error" set forth in the reissue oath was the alleged error that the propellant had not been claimed with sufficient breadth. The only facts asserted in the reissue oath which were said to have led to the discovery of the alleged error were "facts" relating to the alleged enhanced luster of PVP films deposited from alcohol solution, which facts were allegedly learned during the course of the interference proceeding and well prior to the termination of prosecution of the original application. The "fact" of such enhanced luster was allegedly known to Mr. Spiegel as early as 1951 when he first applied PVP solutions to Mr. Smith's hair (DX 3A, pp. 59–61 & 237–8). The Court finds that since all of the alleged facts were known to the patentee well before he elected to have his original patent issue, there was no inadvertence, accident or mistake to justify a reissue patent. Any alleged error was an error in judgment.

70. The "invention" covered by the reissue claims was not presented in the application until more than one year after it had been in public use and on sale in this country.

71. The patent as issued and as originally filed refers to "lacquers, principally shellac solutions * * *" in the third paragraph, but the patent makes no reference to aerosol shellac materials employing Freon and anhydrous alcohol which were known to Mr. Spiegel prior to his alleged invention (Finding 28). Nor is there any reference to such prior art aerosols employing anhydrous alcohol and Freon in any written document filed in the Patent Office (3394; 3448). The Patent Office was never advised of the existence of shellac aerosols employing anhydrous alcohol which were in commercial use prior to Mr. Spiegel's work with PVP.

72. In 1953, La Maur filed a "Petition to Make Special" (also called a Petition for Advancement of Application) (DX 4, p. 20) in order to expedite the issuance of its patent. An affidavit of Mr. Spiegel, accompanying the petition alleged that a similar product was being made by another (a product called "Aqua Net" manufactured by Rayette) (DX 4, pp. 24–6). The petition was also accompanied by an affidavit which asserted that a "diligent and thorough search of the prior art" had been made and that no prior reference was located which would stand in the way of an allowance of the application (DX 4, pp. 21–3). It is the duty of an applicant to disclose the most pertinent prior art known to him in connection with such a Petition (3397–8; 3448–9; 3494–6). The Court finds that this duty to disclose was not satisfied by the patentee.

73. The Court is not unmindful of La Maur's assertion that an Argentine patent (PX 15, item 6) disclosed the "equivalent" of shellac, anhydrous alcohol and Freon hair sprays but there is no teaching in the Argentine patent that anhydrous alcohol is a necessary requirement and the film-former is not shellac.

74. The Court is aware of La Maur's contention that shellac aerosols were called to the attention of the Patent Office during an oral argument in the interference proceeding involving La Maur's application but the record indicates that even assuming that such oral statement was made, the shellac aerosols were referred to only in general terms and no mention was made of the fact that such products included "anhydrous" or "substantially water-free" alcohol (2341; 2379–80). The limitation "substantially water-free" appearing in all of the claims is a critical limitation required by the patent. The rules of the Patent Office require all business to be transacted in writing, and under such requirement the alleged oral statement is ineffective as a communication (3425–6). The Examiner's decision was not rendered until five months after the oral argument (PX 115, pp. 28 & 207). The oral argument also took place subsequent to the time that the claims in issue had been allowed by the Patent Office and it is unlikely for an Examiner to reverse a previous finding of patentability (3432–5).

75. The Court finds that one of the most pertinent portions of the prior art which was presented to the Court was not before the Patent Office in its consideration of the patentability of the alleged invention.

76. The Court has considered La Maur's contention that the use of a water soluble film forming material in a hair lacquer was unique with Mr. Spiegel and contra-indicated by the prior art on the ground that it would not be expected that a water soluble material would provide suitable moisture protection. There was extensive and contradictory testimony in this regard. The Court finds that this contention is not supported by the weight of the evidence. Finding 77 sets forth the facts which we believe establish that the use of water soluble film formers in hair sprays was both known and obvious to one having ordinary skill in the hair preparation art.

77. There is substantial evidence in the record which establishes the use and recommendation of water soluble film formers for application to a finished coiffure in "hair lacquers" prior to Mr. Spiegel's alleged invention. Illustrative of such evidence is the following. The patent itself states, "The lacquers may be insoluble in water," (col. 1, lines 37–8), indicating that the prior art lacquers may or may not have been water soluble. Commencing in 1945, La Maur made and sold a product known as Style which contained corn sugar (a water soluble film former) in aqueous solution which was recommended for use as a hair lacquer (DX 3B, p. 36; DX 1) and which was used as a hair lacquer (DX 3B, p. 35–6; 2959, 2976). Four prior art references (Janistyn, Harry, DeNavarre and Bennett) all disclose "Hair Lacquers," and their formulations include water soluble products in water solution as well as alcohol soluble products in alcohol solution; all of these hair lacquers are recommended for use in setting or holding or fixing the finished coiffure. "Elastolac," a water soluble shellac material (1752; DX 3A, p. 304), was formulated early in 1949 in the first Liquinet product (DX 22A & B), and was recommended for use in a hair lacquer by Bennett (DX 14). La Maur's expert beautician, Mrs. Heldt used materials containing water as a hair lacquer for a finished coiffure before the advent of aerosols (3748).

78. Further, we cannot accept La Maur's contention that a product containing over 5 per cent water (La Maur's definition of "substantially water-free") will not serve adequately as a hair lacquer on a finished coiffure. The courtroom demonstrations satisfied this Court that greater amounts of water would not cause damage thereto. (See Findings 77, 91, 92 and 93).

79. La Maur contends that moisture protection was the main function of a hair lacquer; this contention was controverted by the most credible evidence. By way of example, there is no suggestion of the moisture protection function in the patent itself, the patent application as filed, the file histories of the original patent and its reissue and the interference file (DX 4; DX 5; PX 115) or in the *Barr* suit. The label directions on La Maur's Style aerosol made in accordance with the patent refer to the holding function of a hair lacquer, but make no mention of a moisture protection function (PX 19B; PX 14). The patentee defined a hair lacquer (which he called a "hair finishing spray") with respect to its function of gluing or cementing, but made no reference to the moisture protection function (DX 3B, p. 7). There is much credible evidence that the important function of a hair lacquer was to hold the hair in place to protect it from the wind (3291–2; 2977; 2969; 2976; 3746; 3801).

80. The record is devoid of credible evidence to show that a PVP film effectively resists moisture or, as La Maur expresses it, serves the function of a "raincoat." A demonstration in the courtroom indicated that the water soluble material, PVP, after being heavily applied as a film on the hair, washes away easily by spraying (3871–7).

81. La Maur contends that a "winding lotion" (setting lotion) always employs a water soluble film former and at least 70–75 per cent water (1381–2) and is usable only in the preparation of a finished coiffure, whereas the so-called "hair finishing spray" (hair lacquer) is said to be usable only on a finished coiffure and contains only alcohol soluble materials in substantially water-free alcohol. The Court is satisfied that there are two general classes of products both describable as "hair fixatives" which are used upon the hair; one class involves water soluble and water containing film formers and is applied to the hair to set a configuration prior to formation of the finished coiffure, and the other is applied to the finished coiffure to set or hold it in place. The latter, however, contrary to La Maur's position, often contain *water soluble* film formers in *water containing* solutions. (Finding 77).

82. La Maur contends that the two classes of materials referred to in the previous Finding are mutually exclusive, and thus argues that the Janistyn teaching did not anticipate the instant "invention." (329–30; 797–8). This contention is not supported by the weight of the credible evidence. The 1945 Style product referred to in Finding 77 above was used both as a setting lotion and as a hair lacquer. The patented Style aerosol product was used both as a lacquer and as a setting lotion when applied to wet hair (989; 1110; 1123–4; 2188–9; DX 3B, p. 33) and was recommended for such uses (989; PX 19B, PX 14). Similarly, Liquinet was recommended for both uses. (DX 22 C & D; 1292–4).

83. In connection with the language in the application as originally filed as set forth in Finding 56, above, which equated water-containing and water-free PVP compositions in function and effectiveness, La Maur contended that this language applied only to a "winding lotion" and not a "hair finishing spray," that the reference to the "winding lotion" as disclosed in the original application was "abandoned" after the citation of Janistyn and upon filing of the 1958 amendment, and that the patent as issued related only to a "hair finishing spray" (583; 585; 611).

84. The Court finds that the contention of La Maur concerning the abandonment of the winding lotion product as set forth in the preceding Finding has no basis in fact and further finds that the patent application as originally filed disclosed a single product capable of a non-aerosol use whether water was present or not, and of an aerosol use when anhydrous alcohol and Freon were employed (see DX 3A, 150–2). The 1958 amendment itself states (DX 4, p. 103):

"The substance of the amendment to the specification essentially consists of a rewriting of a portion of the specification to incorporate the structure of the PVP monomer, and to improve the language, without changing the substance as previously presented."

85. La Maur contends that the primary purpose of "winding lotions" is to provide lubricity and to facilitate the handling of the hair while it is being wound on a curler and that the primary purpose of "hair finishing sprays" is to provide moisture protection. The Court finds that setting or "holding" is a main function of both "winding lotions" (2047, DX 71, DX 72) and "hair finishing sprays" (Finding 79) and therefore that the film forming ingredients in both classes of materials serve analogous functions.

86. The Court is not unmindful of the extensive testimony of Dr. Mark, an expert in polymer chemistry. Dr. Mark tentatively proposed an hypothesis purporting to explain the alleged superiority of a PVP film deposited from alcohol solutions as against a PVP film deposited from water containing solutions with regard to effectiveness as a "raincoat" on the hair (1672–3). The hypothesis does not alter the obviousness of the alleged invention at the time it was made. The hypothesis was formulated shortly prior to the trial and Dr. Mark admitted that the alleged facts which the hypothesis purports to explain were unknown to Mr. Spiegel at the time that the application was filed (1541; 1684–6).

87. Dr. Mark's hypothesis which purports to explain the alleged superiority of a PVP film cast from a substantially water-free alcoholic solution presumes a superiority which has not been established; Dr. Mark brought forward no experimental data to show a comparison with PVP films cast from water containing solutions insofar as moisture protection is concerned although he said he had made such tests (1625).

88. It was admitted that Dr. Mark's hypothesis was tentative (1541), unsupported by further experimental results which would make it a plausible theory (1679; 1745–9) and that future experiments might modify or amend his hypothesis (1685–6).

89. The Court is also aware of La Maur's contention that PVP was not considered as a resin at the time Mr. Spiegel made his alleged invention. It appears to the Court that this assertion is made in order to avoid the conclusion set forth in the *Barr* case that what Mr. Spiegel did in substituting one resin for another was obvious. The question of whether or not PVP was considered a resin is largely a matter of semantics; the important matter is whether or not PVP was known to have film forming characteristics which would set or hold the hair; PVP was known to have these characteristics prior to the alleged invention. The Court finds, contrary to the assertion made that PVP was not classified as a resin in 1951, that some recognized authorities considered PVP to be a resin prior to 1951 (DX 16; DX 42; 1724–7).

90. The Court has also considered La Maur's contention that others did not produce a PVP hair spray prior to Mr. Spiegel. The Court finds that the obviousness of what Mr. Spiegel did is not affected merely because others had not earlier produced such a hair spray. Factors such as the price of PVP, familiarity and knowledge of the aerosol art, and matters of business judgment, rather than any alleged inventive concept, all relate to what was done and what was not done by Mr. Spiegel and by others.

91. The Court had the benefit of viewing actual water-containing materials sprayed on a finished coiffure by two beauticians, Miss Anderson on behalf of D&D and Mrs. Heldt on behalf of La Maur. These courtroom demonstrations established to the satisfaction of the Court that materials containing more than the "substantially water-free 5 per cent" can be sprayed upon a finished coiffure without destroying same, contrary to La Maur's contention. (Findings 81 and 82).

92. Miss Anderson sprayed one coiffure with an aerosol composition in a glass bottle containing 17 per cent water in the concentrate with 4 per cent PVP (PX 7D; 3151–2 & 3154). A second head of hair was sprayed with Wella lacquer (DX 16) which initially contained 60 per cent water (3235–6) and was further diluted with 50 per cent pure water resulting in a final composition containing 80 per cent water (3258–9). The coiffure sprayed with the 17 per cent water composition and the 80 per cent water composition remained in place without any noticeable destruction (3307–8). Each coiffure had a film that felt the same upon drying (3307; 3312).

93. Mrs. Heldt, in rebuttal, sprayed four heads of hair on one side with PVP materials in anhydrous alcohol (PX 152, 153 & 154). On the other side of each head two of the coiffures were sprayed with PVP in pure water (PX 151 & 155) and the other two were sprayed with a Wella-water mixture similar to that used by Miss Anderson (3764–6; 3820). The half heads sprayed with the water-containing materials resulted in destruction of the coiffures, but the Court finds that such demonstrations did not establish La Maur's contention that a hair lacquer cannot be employed when it contains more than a "negligible" amount of water. In no instance was a half head sprayed with a quantity of water less than 80 per cent. A much greater quantity of all of the water-containing materials were sprayed than would normally be applied in regular use.

94. It was admitted by Mrs. Heldt that a good job could be done on a finished coiffure with a water-containing hair spray (3834). It was also established that Mrs. Heldt was told to use much more of these materials than she would have normally used (3848–9).

95. Based upon the most credible evidence and considering the manner in which the demonstrations were made and the products that were used, the Court finds that the demonstrations by Miss Anderson established that a finished coiffure can be sprayed with a hair lacquer that is not "substantially water-free" without a destruction of the coiffure.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to this action and the subject matter thereof.

2. The decision of the Court of Appeals for the Eighth Circuit holding the original Spiegel patent invalid should be followed in the absence of apparent error of law or fact, particularly where the facts relied on by the Court of Appeals for the Eighth Circuit have been established here. American Air Filter Company, Inc. v. Continental Air Filters, Inc., 347 F.2d 931 (6 Cir., 1965); Hunt v. Armour & Co., 90 F.Supp. 767, 769 (N.D.Ill., 1950) aff'd 185 F.2d 722 (7 Cir., 1950); Williams v. Hughes Tool Co., 186 F.2d 278, 281 (10 Cir., 1950); General Motors Corp. v. Leishman, 85 F. Supp. 187, 188 (D.C.Cal., 1949).

3. The decision of the Court of Appeals for the Eighth Circuit holding invalid the first nine claims of the re-issue patent in suit is persuasive of the invalidity of the remaining two claims (Claims 10 and 11) which are broader than the claims which were held invalid.

4. The presumption of validity attaching to the grant of the Spiegel patent is rebuttable, particularly when the Patent Office did not have all of the most relevant prior art before it. Murdock v. Vaughan Novelty Mfg. Co., 131 F.2d 258, 259 (7 Cir., 1942); A R Inc. v. Electro-Voice, Incorporated, 311 F.2d 508, 512–513 (7 Cir., 1962); Hobbs v. Wisconsin Power & Light Company, 250 F.2d 100, 105 (7 Cir., 1957), cert. den. 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762; Makray v. Landis Tile & Mfg. Corp., 206 F.Supp. 263, 269 (N.D.Ill. 1962).

5. The claims of the Spiegel patent are invalid because the use of PVP in an aerosol composition together with anhydrous alcohol and Freon was obvious to those having ordinary skill in the art. It was not inventive to substitute PVP for shellac in the anhydrous alcohol-Freon environment required in an aerosol when both PVP and shellac were known to be useful as film-formers which held the hair in place. Title 35, U.S.C. Sec. 103; Mandel Brothers, Inc. v. Wallace, 335 U.S. 291, 296, 69 S.Ct. 73, 93 L.Ed. 12, 16; Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 333–335, 65 S.Ct. 1143, 89 L.Ed. 1644, 1648–1649 (1945); Armour & Co. v. Wilson & Co., 168 F.Supp. 353, 354–355 (D.C.N.D.Ill.E.D., 1958) aff'd 274 F.2d 143, 149 (7 Cir., 1960); Johnson & Johnson v. Kendall Co., 327 F.2d 391, 395 (7 Cir., 1964); Pleatmaster, Inc. v. J. L. Golding Mfg. Co., 240 F.2d 894, 897–898 (7 Cir., 1957); National Pressure Cooker Co. v. Aluminum Goods Mfg. Co., 162 F.2d 26, 28–29 (7 Cir., 1947).

6. The claims of the Spiegel patent are invalid because it was not inventive to utilize PVP, taught to be useful as a hair fixative, for a similar, or analogous use. Title 35, Sec. 103; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 327, 65 S.Ct. 647, 89 L.Ed. 973, 979 (1945). Mandel Brothers, Inc. v. Wallace, 335 U.S. 291, 296, 69 S.Ct. 73, 93 L.Ed. 12, 16 (1948).

7. The alleged "compatability discovery" that PVP is miscible in an anhydrous alcohol-Freon system does not convert the patentee's obvious composition to an unobvious one merely because a single and obvious experiment may have been necessary to establish that the composition was compatible or miscible. Mandel Brothers, Inc. v. Wallace, 335 U.S. 291, 295, 69 S.Ct. 73, 93 L.Ed. 12, 15 (1948); Application of Moreton, 288 F. 2d 940, 943–944, 48 CCPA 928 (1961); Naamlooze Venootschafs, etc. v. Coe, 76 U.S.App.D.C. 313, 132 F.2d 573, 575 (1942).

8. The use of water-free compositions was a requirement of the aerosol art. Assuming *arguendo*, that a film from a water-free PVP composition had unexpected properties, such properties were inherent and latent and cannot create unobviousness where none existed initially. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 248–249, 66 S.Ct. 81, 90 L.Ed. 43, 47 (1945); Armour & Co. v. Wilson & Co., 168 F.Supp. 353, 359 (D.C.N.D.Ill.E.D.

1958), aff'd 274 F.2d 143 (7 Cir. 1960); In re Gauerke, 86 F.2d 330, 333, 24 CCPA 725 (1936); Application of Prindle et al., 297 F.2d 251, 254, 49 CCPA 882 (1962).

9. Patentability cannot be predicated on allegedly superior properties of PVP films deposited from water-free alcohol solutions as against PVP films deposited from water-containing solutions because neither the patent nor the original patent application discloses any such superiority and because both the patent and the original patent application specifically deny that any such superiority exists. Sherman v. Moore Fabrics, Inc., 179 F.Supp. 74, 78 (D.C. R.I., 1959); Schindler et al. v. Commissioner of Patents, 242 F.Supp. 540 (D.C. D.C.1965); Application of Lundberg, 253 F.2d 244, 247, 45 CCPA 838 (1958); Application of Crawford, 250 F.2d 370, 373, 45 CCPA 750 (1957); Application of Stewart, 222 F.2d 747, 754, 42 CCPA 937 (1955); Application of Honnig, 193 F.2d 191, 193–194, 39 CCPA 740 (1951); Application of Dalzell, 166 F.2d 834, 840, 35 CCPA 1024 (1948).

10. The Spiegel patent is invalid because it is predicated on new matter inserted into the specification in that the term "substantially water-free" is not supported in the original specification and in that there is no disclosure in the original specification of the alleged necessity of having "substantially water-free" compositions for non-aerosol use. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 54, 59 S.Ct. 8, 83 L.Ed. 34, 37–38 (1938); Mackay Radio & Telegraph Co. v. Radio Corporation of America, 306 U.S. 86, 101, 59 S.Ct. 427, 83 L.Ed. 506, 514 (1939); Coltman v. Colgate-Palmolive-Peet Co., 104 F.2d 508, 515–517 (7 Cir., 1939).

11. The Spiegel patent is invalid because it is predicated on the alleged superiority of PVP films deposited from water-free alcohol solution as against PVP films deposited from water-containing solutions, and such superiority, if it exists, is a matter of degree.

Dow Chemical Company v. Halliburton Oil Well Cementing Company, 324 U.S. 320, 329, 65 S.Ct. 647, 89 L.Ed. 973, 980 (1945); In re Macallum et al., 102 F.2d 614, 616 (C.C.P.A.1939); Hyster Company v. Hunt Foods, Inc. et al., 263 F.2d 130, 133 (7 Cir., 1959); Simmons Co. v. Superior Felt & Bedding Co., 107 F.2d 536, 540 (7 Cir., 1939); The S. O. S. Company v. Triangle Manufacturing Company, 156 F.Supp. 665, 672, (N.D. Ill., E.D., 1957); Deller's Walker on Patents (Second Edition–1964) Volume Two, pages 271–8.

12. The patent is unenforceable because the patentee failed to disclose to the Patent Office his knowledge of the prior public use of shellac aerosol hair sprays after he undertook a duty to disclose the closest prior art known to him when he petitioned the Patent Office to advance the examination of his application and accompanied his petition with an affidavit purporting to disclose such prior art. Plechaty Co. v. Heckett Engineering, Inc., 145 F.Supp. 805, 810 (N.D.Ohio, 1956); Tipper Tie v. Hercules Fasteners, 130 F.Supp. 3, 9 (D.N. J., 1955) aff'd 232 F.2d 635 (3 Cir., 1956).

13. Although the patentee may not have had actual knowledge of prior art suggesting the use of PVP as a hair fixative, he is presumed to have had such knowledge. Evans v. Eaton, 3 Wheat. 454, 514, 4 L.Ed. 433, 448 (1818); Sewall v. Jones, 91 U.S. 179, 180, 23 L.Ed. 275, 276 (1875); Smith v. Dravo Corp., 203 F.2d 369, 380 (7 Cir., 1953).

14. Claims 10 and 11, added by reissue, are broader than the first nine claims and hence are invalid for the same reasons that the first nine claims are invalid. See authorities cited in the previous conclusions of law.

15. The reissue claims are invalid because they are broad enough to include the normal use of PVP hair sprays in anhydrous alcohol and Freon and such hair sprays were obvious to those having ordinary skill in the art. (See authorites cited in Conclusions 5, 6, 8 and 9).

16. The reissue claims are also invalid because they are not drawn to an invention which was legally disclosed in the original patent. The improper insertion of new matter in the 1958 amendment provided the basis for the reissue claims and this is not an appropriate basis for a reissue. Title 35 U.S.C. Sec. 251; United States Industrial Chemicals v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 679–681, 62 S.Ct. 839, 86 L.Ed. 1105, 1114 (1942); Freeman v. Altvater, 138 F.2d 854, 859 (8 Cir., 1943); Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 249 F.2d 66, 68 (4 Cir., 1957).

17. The reissue claims are also invalid because they are not predicated upon the "error" asserted in the reissue oath, but upon a later discovered "error," with regard to which no verified showing was made. The reissue claims are not supported by the reissue oath. Fiberjoint Corporation v. W. R. Meadows, Inc., 112 F.2d 322, 326 (7 Cir., 1940).

18. The reissue claims are also invalid because there was no inadvertence, accident or mistake since the patentee knew all the "facts" alleged in his reissue oath to have led to the discovery of his "error" well before he elected to have his original patent issue. Dobson v. Lees, 137 U.S. 258, 264, 11 S.Ct. 71, 34 L.Ed. 652, 655 (1890).

19. The reissue claims are also invalid because they are broader than the original claims and broader than the reissue claims originally presented and the doubly broadened subject matter was not claimed until more than two years after the original patent had been granted. Title 35 U.S.C. Sec. 251.

20. The reissue claims are also invalid because the subject matter thereof was neither disclosed nor claimed in the original application as filed and was neither disclosed nor claimed in any application pending before the Patent Office until more than one year after the "invention" had been placed in public use and on sale in this country by La Maur and by others. Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co., et al., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171, 1178 (1942); Crane Packing Co. v. Spitfire Tool & Machine Co., Inc., 276 F.2d 271, 274 (7 Cir., 1960)

21. The alleged failure of specific persons prior to the patentee to produce the patented composition does not establish unobviousness for the patentee, particularly, when such persons did not have knowledge of all of the prior art. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 476, 55 S.Ct. 449, 79 L.Ed. 997, 1004 (1934); Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334, 1338 (1938); Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 333–334, 65 S.Ct. 1143, 89 L. Ed. 1644, 1648 (1945); The J. R. Clark Company v. Murray Metal Products Company, Inc., 219 F.2d 313, 318 (5 Cir., 1955).

22. Commercial success cannot create patentability in the absence of invention. Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corporation, 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162, 167 (1950); Kennatrack Corporation v. Stanley Works, 314 F.2d 164, 168 (7 Cir., 1963).

23. While an award of attorney fees may be granted in an exceptional case, such an award is within the discretion of the trial court. Title 35, U.S. C. Sec. 285; Blanc v. Spartan Tool Co., (7 Cir., 1948) 168 F.2d 296.

24. Section 285 is remedial, not penal, and should be invoked only when vexatious and unjustified litigation is clearly shown. Phillips Petrol. Co. v. Esso Standard Oil Co., (D.C.Md., 1950) 91 F.Supp. 215.

25. The Court does not find present such equitable considerations as to make it grossly unjust that the prevailing party be left to bear the burden of its own counsel fees. The demand for counsel fees is denied. Jacquard Knitting Mach. Co. v. Ordnance Gauge Co., 213 F.2d 503 (1954); Chem. Const.

Corp. v. Jones & Laughlin Steel Corp., (C.A.Pa., 1962) 311 F.2d 367; Binks Mfg. Co. v. Ransburg Corp., (7 Cir., 1960) 281 F.2d 252, cert. dis. 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239.